## Commonwealth of Pennsylvania *v.* Frank Mika, Appellant.

*Criminal law—Murder—Evidence—Dying declarations.*

On the trial of an indictment for murder, where it appears that three hours after the deceased was shot the prisoner was brought into his presence, and the deceased accused him of being the guilty agent, dying declarations taken by a justice of the peace shortly afterwards are admissible in evidence, although the deceased gave his statement in a foreign language, which had to be interpreted to the magistrate making the written statement, and for that reason the entire testimony was not reduced to writing; and it is not improper in such case for the court to charge the jury that contradictions and inconsistencies in the statement may not have been in the statement of the deceased as given to the interpreter; that the whole of his testimony may not be in the statement.

*Murder—Evidence—Degree of crime—Burden of proof.*

On the trial of an indictment for murder when the commonwealth has satisfied the jury beyond a reasonable doubt that the defendant committed the homicide, the burden of raising the crime above the grade of murder of second degree rests upon the commonwealth, and the burden of reducing it to a lower grade rests upon the defendant.

*Murder—Charge of the court.*

The Supreme Court will not reverse a verdict of guilty of murder of

the first degree, because the trial judge adopted the commonwealth's theory by which possible inferences unfavorable to the prisoner, to be drawn by the jury from the evidence, were suggested where the charge as a whole in connection with the testimony properly before the jury was a correct and adequate presentation of the law, applicable to the facts which the testimony tended to establish, and presented the whole of defendant's case quite as favorably as it should have been presented.

Argued April 24, 1895. Appeal, No. 78, Jan. T., 1895, by defendant, from judgment of O. & T., Clearfield Co., Dec. T., 1893, No. 82, on verdict for murder in the first degree. Before STERRETT, C. J., GREEN, MITCHELL, DEAN, and FELL, JJ. Affirmed.

Indictment for murder. Before GORDON, P. J.

At the trial the testimony was in effect that on the night of Nov. 21, 1893, Vincent Lucasovich was wounded by a pistol bullet, which entered his left breast about two inches below the heart, resulting in his death about 48 hours thereafter. He had been boarding in the house of William Losee, about a mile and a half or two miles west of Houtzdale. On the day he was shot he had come home from his work in the mines before noon, and after washing himself, without staying for dinner, he went to Houtzdale. From the testimony of William Losee and his wife, it appeared that he returned home about 10 p. m. He was admitted to the house by Mrs. Losee, and passing through the room of Losee and his wife he went up stairs to his own room, and apparently to bed. Losee and his wife then went to sleep. Mrs. Losee testified that she was awakened by a noise outside of the house about eleven o'clock. She heard some one cry "William, William, William." The deceased went out and subsequently returned. As he passed through the room of Losee and his wife on his return, it was noticed, according to their testimony, that he carried his arm close to his side. He passed through their room and up to his own room. About five minutes thereafter they heard him crying with pain. They went to his room and found him in great pain from the wound which afterwards caused his death. When they inquired about it he replied, "Didn't you hear? My ' butty ' shoot me."

About three hours later defendant was arrested by officer

Kinney and taken before deceased at the house of William Losee. Kinney testified that he brought the defendant down to the house of William Losee and took him upstairs into the presence of deceased; that the defendant and deceased started to talk between themselves in the Slavish language, which witness did not understand, but that Losee who was present told him what they said.

Kinney further testified: " Q. Did you hear Lucasovich say anything in any language you could understand? A. Well the only thing I could understand—I understood it, 'him shoot me.' I understood that. Q. Lucasovich said that? A. Yes, sir; that was when he (meaning Mika) was on his two knees and denied it, 'Him shoot me.' Q. He said that in English? A. That is what I understood him to say."

After the conversation between the deceased and the prisoner at Losee's house, the officer, Kinney, took the prisoner to Houtzdale and put him in the lockup there. The officer then went to John B. McGrath, a justice of the peace in that borough, and the justice, together with the officer, a Polish priest, Rev. Segesmond Susczyinski, and Joseph Gdenic, a Polish schoolteacher, went to the house of Wm. Losee, where deceased was, and after the administration of the last rites of the Catholic church to deceased, his dying declaration was taken. The deceased was sworn. He told his story to Father Susczyinski who translated it into English to McGrath, who in turn reduced it to writing. The commonwealth offered the dying declaration as follows :

"Before me, a Justice of the Peace in and for said county, personally came Vincent Lucasovich, who after being duly sworn according to law, saith as follows: My name is Vincent Lucasovich. I am 26 years old, past. I am sure that Frank Mika shot me. Last night about half past ten o'clock I was in the yard of Wm. Losee, near West Moshannon, when I heard some one call out, 'William! William!' several times. He was singing before he hallooed and I recognized the voice of Frank Mika. I said, 'Go home, and don't make a noise here.' He answered, 'I will go home, and you go home and go to bed with God.' He spoke in Slavish, which I can understand; just then he shot me; I saw the fire. We had been in town

drinking and he asked me if I had a revolver, and I showed him my revolver. He said, 'Do you want the revolver back?' I said, 'Yes.' Then he said he wouldn't give it to me, because I had no license to carry it, and he could bring the Constable and arrest me. I was afraid and I left him have the revolver, and left him. I started home and Mika followed; we stopped at Carter's hotel. We met an English-speaking man with big moustache, the same who was here to-night—Albert Reeser—at the Swan hotel, and we went together to Carter's. I didn't see Mika after leaving Houtzdale until I saw him at the road when he shot me. Mika was about six yards from me, standing in the road when he shot me. About a week ago we had a little trouble in the Swan hotel, and Mika was going to shoot me. Albert Kachka saw the revolver. I got away from him when I saw him take out the revolver and got away. The English people called a Constable. This was last Thursday evening about six or seven o'clock. We made up friends and were all right to-day, the trouble we had was about the work. Mika worked with me. When we were in the hotel—Mrs. Mc-Mahon's—to-day Mika said he would remember me. We had some words about the revolver. I make this statement with the belief that I am going to die.

his<br>
" VINCENT  ✕  LUCASOVICH."<br>
mark

Defendant's counsel make the following objections:

1. The statement is incompetent and inadmissible as a whole.

2. The following words: " We had been in town drinking and he asked me if I had a revolver, and I showed him my revolver. He said, 'Do you want the revolver back?' I said, 'Yes.' Then he said he wouldn't give it to me, because I had no license to carry it, and he would bring the constable and arrest me. I was afraid and left him have the revolver and left him."—And the statements in these words: " About a week ago we had a little trouble in the Swan hotel, and Mika was going to shoot me. Albert Kachka saw the revolver. I got away from him when I saw him take out the revolver, and got away. The English people called a constable. This was last Thursday evening about six or seven o'clock. We made up friends and were all right to-day and

the trouble we had was about the work. Mika worked with me. When we were at the hotel—Mrs. McMahon's—to-day Mika said he would remember me. We had some words about the revolver "—are incompetent and inadmissible, because they relate to antecedent matters and are therefore no part of the facts immediately connected with the shooting and at a time too remote to make them admissible either as dying declarations or part of the res gestæ.

3. The defendant further objects to that portion of the written statement which is in these words, namely : " *I am sure that Frank Mika shot me.* Last night about half past ten o'clock I was in the yard of William Losee, near West Moshannon, when I heard some one call, 'William! William!' several times. He was singing before he hallooed, and I recognized the voice of Frank Mika. I said, 'Go home and don't make a noise here.' He answered, 'I will go home, and you go home and go to bed with God.' He spoke in Slavish, which I can understand ; just then he shot me. I saw the fire."

And the further words, namely : "I didn't see Mika after leaving Houtzdale until I saw him at the road when he shot me. Mika was about six yards from me standing in the road when he shot me," when read with the testimony of John B. McGrath, as to the reason and the means by which the deceased knew it was Mika who shot him, are but the expressions of an opinion and belief, and not a statement of facts, and therefore inadmissible.

4. The defendant further objects that it does not sufficiently appear that the deceased had no further hope of recovery and was informed by the physician that he would die, or that the wound was necessarily mortal.

The Court: Objection 1st overruled.

Objection 2d sustained and evidence excluded.

Objection 3d sustained so far as it refers to the words of the statement underscored, viz : " I am sure that Frank Mika shot me," and said testimony is excluded and overruled as to the balance.

Objection 4th overruled, the deceased, having been informed that he would not recover, had given it as his opinion that he would not, and the court being convinced from the evidence that he had no hope of recovery.

Bill sealed for defendant.

The court charged the jury in part as follows :

[So, then, if you are satisfied that the defendant did the killing, in order to reduce the grade of the offense to a lower grade of homicide than murder in the second degree, the burden is on the defendant, and to raise it to murder of the first degree the burden is on the commonwealth. . . .

The commonwealth, of course, must satisfy you beyond a reasonable doubt that he did the killing, and when having done so, the burden of raising it to a higher degree of crime is upon the commonwealth and to reduce it to a lower grade of crime is upon the defendant.] [2] . . .

[While it is true these dying declarations were made when the accused was absent, and without the benefit of cross-examination to elicit testimony in his own behalf, and strictly speaking it is hearsay evidence, yet the law recognizes that as legitimate testimony, and it would seem that considering all of the circumstances, all hope of recovery gone, preparation for death made and all motives for falsehood taken away, if a man should be expected to confine himself strictly to the truth in what he had to say, it would be one situated as this dying man was. It was no time for anything but that which was solemn and serious, and the strongest evidence that the dying man so looked at it is the fact that he had received from the minister of his church, whose tenets taught him it was not fitting for a man to rush unanointed into the presence of his God, the last rites and benediction appropriate to such a solemn occasion.] [3] . . .

[It is claimed, however, that there are contradictions in this declaration. All of these, gentlemen of the jury, you are to consider, but you must remember this in passing upon the question and in considering the credibility to be given to this item of evidence, that it is not pretended that this dying man's whole testimony was reduced to writing; the evidence has convinced you, I have no doubt as it has me, that there was a great deal said there in that foreign language which failed to get through the interpreter and onto 'Squire McGrath's written statement; the questions had to be asked him in his own mother tongue, a foreign language which the justice could not understand. He had to reply to the interpreter and the interpreter in turn to the justice. Now there is no pretense

in this case that all of this man's testimony was taken down, and if you find inconsistencies and contradictions in the testimony as thus reduced to writing, you must take into consideration that these inconsistencies may not have been in his testimony as given to the interpreter. The whole of his testimony may not be in this writing.] [4] . . .

[Now it is true, gentlemen of the jury, that the evidence shows that the deceased, before consenting to go to that wedding insisted upon this defendant leaving his revolver at home. Just what he meant by that is for you, gentlemen of the jury, to conclude. Whether he felt he was afraid of his life does not appear in the testimony. All that we can know about this matter is inferences that can be drawn from the facts proven by these witnesses.] [5]

[Well, now, gentlemen of the jury, that is a question for you, just how far you will consider this item of evidence. It is true that all of this conduct on the part of this man may have been feigned. If he were bent on murder, if he had malice in his heart and had intended deliberately and willfully to take the life of this man, he could have feigned all of these things, but, whether he did or not, and whether there is anything in the evidence to show that he did, is a question for you. There is nothing here to show, gentlemen of the jury, that he acted in any other way than naturally, just as a man would under ordinary circumstances.] [6]

[It is true it is not conclusive; it was not impossible for this defendant, after passing this man's house, to have returned again and shot the man. Whether he did or not, if that was the man who passed, in order to convict him you will have to believe that he did. There is no evidence in the cause upon that question, but it is important testimony for you to take into consideration.] [7]

[And there is but a discrepancy in all of the testimony in the case of between five and ten minutes. This defendant passed the house of William Losee, according to the testimony in the case, not longer than between five and ten minutes, at least, before the shooting was done. So that he is upon the ground and it was possible for him to have been present at the time the shooting was done. Whether he was or not, gentlemen of the jury, is a question of fact for you.] [8]

[Now, the defense (alibi) is entirely legitimate and proper. If the accused was not present when the offense was committed and had nothing to do with it, it could be the only defense which he could make. Yet, while casting no reflections upon the defense in this case, we deem it our duty to call your attention to the fact established in capital cases, that the temptation is very great to resort to it as a shield or protection from the consequences of crime.] [9]

[Gentlemen of the jury, there is still another matter to which we desire to call your attention, and that is the fact that if you find from the testimony that this defendant is guilty, that he did the shooting, he having sworn that he did not, as a matter of course you would have to conclude that his testimony was false, and that he had perjured himself. Now, while we do not desire and do not wish to be considered as saying that he did perjure himself, or that he did not, because we have no such desire (and we speak of this matter in the interest of the defendant) if you find that he did do the killing, he having taken the position that he did not, he deprives himself of any explanation, which he otherwise could have made as to the circumstances under which the shooting was done, to reduce the offense either from murder in the first degree or from murder in the second degree. So that if you find, as I said, that he did the killing, you must take into consideration that he is deprived of any explanation which he might have made.] [10]

[And the fact that they may have been reconciled and become friends after that don't take those threats out of the case, don't remove those threats from your consideration, because if enmity existed between these men, and there was malice in the heart of the defendant, even though they were reconciled for a time, that malice might crop out from his heart at any time, and you must take all these things into consideration in deciding whether or not this defendant is guilty.] [11]

Defendant's points, among others, were as follows:

3. That the jury must acquit the prisoner unless the evidence of the facts proved are absolutely incompatible with his innocence and cannot be explained upon any other reasonable theory than that of his guilt. And if they find that the crime could have been committed by another, and the facts proved still be true, they must render a verdict of not guilty. *Answer :*

Gentlemen of the jury, as a statement of the law, that is correct, and we affirm the point. And yet the commonwealth is not bound to prove anything with absolute certainty. That degree of proof is not required in this case. Of course, if you find from the evidence, beyond a reasonable doubt, that the defendant is the man who did the shooting, it would follow from that that nobody else could have done it. But we do not want you to understand that by affirming this point we say to you that if you believe in the period of from five to ten minutes, as to which there is a question whether or not this defendant was on the ground, it was possible for somebody else to have shot the deceased, you must acquit him. That is not the intention of the point as I take it, and is not the law. There might be a possibility that such was the case, but you are to take into consideration all of the circumstances and facts in the case, and if from all the evidence you are convinced beyond a reasonable doubt that the defendant and nobody else did the shooting, then you convict him. . . .

5. That if the jury find that the dying declarations in this case are inconsistent with and contradictory of each other, and are also contradicted by the commonwealth's own witnesses in a part thereof which relates to a material part of the commonwealth's case, then the entire statement must be disregarded and rejected by them in making up their verdict. *Answer:* That is a correct statement of the law, gentlemen of the jury. If the witness is contradicted in a material part of his testimony it must be disregarded. If false in one particular it may be in all. But from this it does not follow, if you find inconsistencies and contradictions in the statement, that you must reject it, for you must remember that the entire testimony of the witness may not have been reduced to writing, as I explained to you before. The credibility to be given to the testimony of the deceased, and the weight to be given to this statement, is entirely for the jury, but we say to you that any inconsistencies and contradictions which you find in the statement, and especially in material parts of it, and its being contradicted by other evidence in the cause, should be carefully considered by the jury in determining the weight to be given to it; and if you should find it to be such as to make the testimony unreliable, you should disregard and reject it in making up your verdict.

The same tests are to be applied to this kind of evidence as are applied to a witness called and examined before you. If the testimony is inconsistent and contradicts itself in a material part of it, of course you must reject the testimony and throw it out of the case, if you find that to be the case.

Verdict of guilty of murder of the second degree.

*Errors assigned* were, (1) admission of dying declaration; (2–11) above instructions, quoting them.

*David L. Krebs, W. H. Paterson* with him, for appellant.— The entire statement of the deceased was inadmissible: 6 Roscoe's Criminal Ev. 34; Whart. Crim. Ev. sec. 276; Shaw v. People, 63 N. Y. 36; Binns v. State, 46 Ind. 311; Moeck v. People, 100 Ill. 242.

The burden of proof never shifts from the commonwealth: Turner's Case, 86 Pa. 54; Com. v. Werntz, 161 Pa. 591.

It cannot be right to submit to the jury to pass upon possibilities which are unreasonable, judged by the natural conduct of men, and in plain contradiction of proven fact: Stouffer v. Latshaw, 2 Watts, 165; Egbert v. Payne, 99 Pa. 239; Morton v. Weaver, 99 Pa. 47.

*A. H. Woodward,* district attorney, *Singleton Bell* with him, for appellee.—The dying declaration admitted contained nothing as to which Lucasavich, if living, would not have been a competent witness: Brotherton v. People, 75 N. Y. 159; Small v. Com., 91 Pa. 304.

The language used by the court below bears only upon the degree of guilt, and was a correct expression of the law: Com. v. Cook, 166 Pa. 193; Com. v. Drum, 58 Pa. 9; Com. v. Cleary, 135 Pa. 64.

If there was some point which the prisoner's counsel regarded as essential to the defense, it was only fair to the trial judge that his attention should have been called to it before the jury left the bar: Com. v. Zappe, 153 Pa. 498.

An impartial examination of the whole charge will disclose that the court not only presented the whole of defendant's case, but presented it fully and fairly: Goerson v. Com., 99 Pa. 388; Meyers v. Com., 83 Pa. 131.

In order that any part of the charge be deemed reversible error, it must not be read alone, wrenched from the body of the charge, but is to be viewed in connection with what precedes and follows it upon the same subject: Com. v. Zappe, 153 Pa. 498.

PER CURIAM, October 7, 1895:

The defendant was indicted for the murder of Vincent Lucasovich, a fellow workman in a coal mine, and was duly convicted of murder of the second degree. The cause of death was a pistol-shot wound, inflicted about midnight in a vital part. Death ensued in about forty-eight hours thereafter. Defendant was arrested about three hours after the fatal shot was fired; and, when confronted by deceased, the latter accused him of being the guilty agent. Shortly afterwards, the dying declarations of the deceased were taken by a justice of the peace; and their admission in evidence constitutes the first specification of error. In view of the circumstances, the evidence was rightly admitted.

The second specification, alleging error in the learned judge's instructions as to the burden of proof, cannot be sustained. The same remark is applicable to the remaining specifications, charging error in adopting the theory of the commonwealth, suggesting possible inferences to be drawn by the jury, and in not giving due weight to the defendant's evidence, etc. When considered as a whole and in connection with the testimony properly before the jury, the learned judge's charge is a correct and adequate presentation of the law applicable to the facts which the testimony tended to establish. It was quite as favorable to the defendant as it should have been. We find nothing in it of which he has any just reason to complain.

A careful examination of the record has failed to disclose anything that would justify us in sustaining either of the specifications of error.

Judgment affirmed, and it is ordered that the record be remitted to the court below, to the end that its sentence may be executed.