Commonwealth *v.* Kent, Appellant.

Argued September 30, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Archibald M. Matthews,* for appellant.

*Thomas F. Lansberry,* District Attorney, and *Paul E. C. Fike,* for appellee.

OPINION BY MR. JUSTICE LINN, November 8, 1946:

This appeal is from conviction of murder of the first degree with sentence of life imprisonment. All the elements of first degree murder appear. The appellant com-

plains that (1) the Commonwealth's demurrer to his plea of. former jeopardy was sustained; (2) his demurrer [1] to the Commonwealth's evidence was overruled; (3) that the evidence is insufficient to sustain the verdict and (4) that his motion for a new trial was refused.

1. This was the second trial, the jury, in the first trial, having been discharged without reaching a verdict. In support of his plea of former jeopardy the appellant contended that the jury in the first trial was discharged for a reason legally insufficient in this Commonwealth. The constitution provides, "No person shall, for the same offense, be twice put in jeopardy of life or limb." Art. I, sec. 10. There are many exceptions to the general statement that a person once in jeopardy may not again be put in jeopardy for the same offense. See *Com. v. Cook,* 6 S. & R. 577, 579 (1822); *Com. v. Barille,* 270 Pa. 388, 113 A. 663; *Com. v. Davis,* 266 Pa. 245, 110 A. 85; *Thompson v. U. S.,* 155 U.S. 271, 274; Kirk: Jeopardy During the Period of the Year Books, 82 U. of P. Law Rev. 602, 603; Administration of the Criminal Law (Am. Law Inst.) Tentative Draft No. 2, p. 36 to p. 56. The question in this case is, Was it absolutely necessary to discharge the jury before verdict, the defendant not having expressly consented? The answer depends on a fact which it was necessary that the judge should find from the evidence then before him. He was not required to discharge the jury unless satisfied by the evidence that such necessity appeared. He considered the evidence before him and stated the facts in an opinion from which we quote. "The case was first tried during the September Term of Court, 1944, and was submitted to the jury at the conclusion of the Court's charge, on Saturday, September 16th, about 3:45 p.m. The jury immediately entered upon their deliberations, and about 11 o'clock in the night of that day they reported that they had not

---

[1] Pursuant to the Act of June 5, 1937, P. L. 1703, 19 P.S. 481.

agreed upon a verdict, and would not likely agree upon a verdict for some time, if at all. Thereupon, the Court suggested that the jury retire for the night. On Sunday morning, September 17th, their deliberations were resumed and continued throughout the day and well into the night, with no change in the result. On Monday morning, September 18th, after the deliberations had extended over forty hours, the jury informed the officers in charge that they were hopelessly deadlocked and would not be able to agree upon a verdict, with the request that this information be reported to the Court. Upon receiving this information, and in advance of the regular hour for convening Court, the District Attorney and the defendant's counsel were called into the Judge's Chambers and informed of the situation. After a consultation between Court and Counsel, it was agreed, because of the illness of one or more of the jurors and their physical exhaustion, that it would be futile to require the jury to deliberate longer, as it would probably result in a coerced verdict, which would require the granting of a new trial in the event of a conviction: Miller v. Miller, 187 Pa. 572. Under the facts and circumstances then existing, both the District Attorney and the defendant's counsel agreed and consented that the jury should be discharged. . . .

"Assuming, however, that neither the defendant nor his counsel acquiesced and consented to the discharge of the jury, there was a more impelling and imperative reason creating an absolute necessity for the discharge of the jury. During the trial of the case, which extended over a period of four days, one of the jurors became seriously ill, which required the care and attendance of a physician on at least two occasions. While he was afforded some relief, the cause of his illness persisted, and this, together with the physical exhaustion and the inability of the jury to agree upon a verdict within a reasonable time, incapacitated him from performing the

duties of a juror in a case of such gravity. A second juror reported that because of the condition of his health and physical exhaustion, he could not hold out much longer. A verdict consented to and rendered necessary because of physical exhaustion is not a true, just and conscientious verdict; and affords ground for granting a new trial: *Com. v. Lutz*, 200 Pa. 226. . . ." ·

We think the illness of the jurors in the circumstances so found brought the case within the rule authorizing the judge to discharge the jury in a capital case without resulting acquittal of the defendant: *Com. v. Davis*, 266 Pa. 245, 247, 110 A. 85.

2. The second and third complaints that appellant's demurrer was overruled and his request for binding instructions was denied may be considered together. As it was conceded that the crime was murder of the first degree, the only question was whether the evidence was sufficient to convict the defendant. No eye-witnesses to the shooting appeared. The jury dealt with the circumstances disclosed. The burden of appellant's argument on this phase of the appeal was that he was convicted on testimony, alleged to be false, given by his mistress and by a very bad criminal record [2] properly admitted in evidence to enable the jury to fix the penalty in case of conviction. The evidence was relevant, the real or apparent contradictions were for the jury. The case was fairly tried, and we may add that it is not without significance that no exceptions to the charge were taken.

George Kern, a resident of Johnstown, left his home in his automobile on Thursday evening, December 9, 1943, at about eight o'clock. His sister, who was his housekeeper, testified that he then had a "diamond ring on" and "quite a roll of money." Next morning, December 10, his car was found in a certain parking lot in Johnstown, unlocked, with the key in the ignition. It

---

[2] Ten or more convictions of felony. See *Com. v. Williams*, 307 Pa. 134, 160 A. 602.

does not appear who placed the car in the parking lot. This lot was 13-2/10 miles from the place where Kern's body was found. The appellant was well acquainted with Kern. On Saturday afternoon, December 11, at about 1:30 o'clock, Kern's body was found by two deer hunters in an open section of woodland in Somerset County near a public road. This point was 9 miles from defendant's residence. The hunters testified "that they found the body partially covered with snow over the top of his clothing. His body was lying on the abdomen with the left hand or arm under the body and the right arm across the center of the back. His hat was off, lying about five feet from the body and his glasses were partially knocked off. When the body was lifted or moved over, pools of blood were found under the head and face and six bullet wounds upon his body, four in the head, one in the back of the neck and one in the back of the body. All of the bullet marks, except the one in the back, were heavily powder burned, indicating that the gun was close to his head and body when the bullets were fired. His trouser pockets were turned out and rifled, his money was gone, and his diamond ring was missing from his finger. The wrist watch worn by the deceased indicates that it stopped at 9:15, but the evidence does not disclose whether it stopped at the time he was felled to the ground or whether it had run down and stopped from lack of winding." The Commonwealth charged that he was murdered and robbed by defendant. The defendant lived with Mrs. Hershberger, though they were not married. They lived in a house referred to in the record as Shaffer's Tavern near a village called Geistown, a short distance from Johnstown. Both appellant and Mrs. Hershberger testified that on December 9th he left their residence at about 6 o'clock p.m. and returned about 11 or 11:30, at which time Mrs. Hershberger was in bed. He testified that he said to her, "Let's go out some places and be seen." She gives a more de-

tailed account. Her evidence is that in response to her question asking why she should "get up" he replied "he wanted to go in [to town] and go around a few places in case something came up later on; wanted to be seen around town." Asked "Did Henry [defendant] have any articles of personal property with him at the time, Stella?" she replied, "He had a large roll of money, it wasn't in a roll, just stuffed in his pocket, had a ring and had a gun. Q. Can you describe the gun that Henry had that night? A. I didn't know what kind it was. He told me it was a 32. Q. Did you observe the color of that gun, Stella? A. It was a dark blue steel gun. Q. The ring that he had, what kind of a ring was it? A. A large diamond ring. Q. Did you ever see that ring before that night? A. No, he never had it before. Q. Henry never had it before, that is what you mean? A. That is right." They "went into Johnstown," to various restaurants and returned home "at 4 or 5 o'clock Friday morning." Mrs. Hershberger testified "Kenneth Weaver picked us up in town and brought us home." On Friday night they "went into town again." On Saturday night, December 13, "around 11 or 12 o'clock he [defendant] and Kenneth Weaver came and wakened me up out of bed and I got dressed and the three of us went" to town again. On the way back, defendant asked Weaver to "drive through" the parking lot in which the victim's car had been found on the preceding Friday morning. He explained his desire to go through the lot by saying "there was a used car in there he wanted to look at."

Many witnesses were called by each side but it is unnecessary now to detail at length the circumstances testified to. The jury was instructed "If you are satisfied beyond a reasonable doubt that the money and the diamond ring, then in the possession of the defendant, were the money and property of George Kern, you may reasonably infer that he was present at the scene of the crime and participated in the commission thereof. Stella

Hershberger further testified that the defendant never had the diamond ring before; that she had seen the ring before in George Kern's possession, and that it was the same ring. There is no positive identification of the diamond ring or the money by anyone. Unless the jury is satisfied beyond a reasonable doubt that the diamond ring and the roll of money in the possession of the defendant on the night of December 9th were the money and property of the deceased, you may not, from these circumstances alone, infer that the defendant was at the scene of the crime or that he perpetrated the deed."

Notwithstanding apparent contradictions in the testimony of Mrs. Hershberger, there is corroboration in essentials concerning which the jury was properly instructed. The defendant's own testimony might well have prevented the jury's having a reasonable doubt of his guilt. He attempted to implicate his sister, Mrs. Colosimo, as the murderess. We all agree the evidence was sufficient to sustain the verdict.

3. The remaining complaint is that a new trial was refused. On this branch of the argument appellant contends (a) that there was error in not requiring his sister, Mrs. Colosimo, to appear and testify; and (b) in ruling that appellant had not made out a right to a new trial for after-discovered evidence. There was no abuse of discretion in not requiring Mrs. Colosimo's appearance. This is clear from the statement of the learned judge: "Said witness, who is a sister of the defendant, was residing at Harrisburg, Pa., at the time of the second trial. She was duly subpœnæd by the Commonwealth, but her attendance at the trial could not be compelled for physical reasons. Two reputable physicians furnished certificates setting forth that she was in a pregnant condition and was expected to become a mother the week following the trial; and that it would be dangerous to her life and well being to compel her attendance at the trial under the circumstances. It has not been shown that her non-

attendance at the trial was in any way prejudicial to the defendant."

The evidence on which the other objection was based was not after-discovered, and was therefore not within the rule invoked. The appellant knew of it long before the trial because the statements on which he relied were said to have been made to him by his sister months before the trial. On this subject, also, we adopt Judge Boose's statement: "One may not read the transcription of the dictaphone recording of the conversation between the defendant and his sister, which has not been made a part of the record, without reaching the conclusion that it is a persistent and importuning effort on the part of the defendant to have his sister incriminate herself as the perpetrator of the crime, and exonerate himself from all blame in connection with the commission of the crime. It falls far short of 'conclusively' proving the defendant's innocence of the crime charged in the bill of indictment." See *Com. v. Mussare,* 281 Pa. 1, 124 A. 742.

The assignments of error are overruled and the judgment is affirmed, and the record is remitted in order that the sentence be carried out.