Commonwealth *v.* Darcy, Appellant.

Argued April 19, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Thomas D. McBride*, with him *Michael von Moschzisker* and *Webster S. Achey*, for appellant.

*Edward G. Biester*, District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 26, 1949:

David Darcy was indicted with three others, Harold Foster, Harry Zietz and Felix Capone,[1] for the unlawful killing on December 22, 1947, of William Kelly, who died as the result of a shot fired by Zietz a few moments after the perpetration of an armed robbery by him, the appellant, Foster and Capone, and while the defendant and his confederates were escaping from the scene. Darcy was tried before President Judge HIRAM H. KELLER and a jury. He did not testify and no evidence was given in his behalf. The jury found him guilty of murder in the first degree and fixed death as the penalty. A new trial was refused and this appeal followed.

At about 11:25 P. M., on December 22, 1947, Darcy and his three confederates arrived at the Feasterville

---

[1] Foster and Zietz were tried jointly and were found guilty of murder in the first degree and the death penalty imposed. Capone entered a plea of guilty. His case has not been further disposed of.

Tavern, located at the junction of Churchville-Newtown-Bustleton Roads, in the village of Feasterville, Bucks County. Darcy, Foster and Zietz entered the tavern while Capone acted as a "lookout" nearby in a parked automobile. Foster ordered "beers" and was served. Within a few minutes Foster went behind the bar, drew a gun and announced that "it was a hold up." Darcy went to the shuffle board room at the rear and said to the six persons congregated there: "It's a stick up." Allen Hellerman said: "Are you kidding?" Darcy then fired two shots at Hellerman's feet and "Eddie" Wunsch began grappling with Darcy. Zietz fired shots at Wunsch and Hellerman, causing the latter's permanent paralysis. Wunsch suffered severe arm and shoulder injuries. Foster fired two shots from behind the bar during the hold up.

Darcy then threatened several patrons with his gun, lined them up against a wall with their hands up, and demanded their wallets and watches. Before taking the watches Darcy declared that he felt like shooting someone, and further remarked: "Where is the police, I feel like shooting some of them?" Foster, who was behind the bar "covering" the proprietor and his wife, rifled the cash register of $78 and $2 from the former.

While these crimes were being committed within the tavern, Mrs. Leutwyler ran across the road to the Buck Hotel and gave the alarm. At the hotel she found the bartender and two other persons, William Kelly and Frank J. Walter. They followed her outside and stood at the intersection of the Churchville-Newtown and Bustleton Roads. While there Horace Patterson, a friend of Kelly, drove out of the Churchville Road and stopped to talk with him and Walter. They noticed a 1939 Plymouth automobile with the engine running, standing in front of the Feasterville Tavern, headed towards Newtown. This car was for the bandits' "get away." Three men ran from the Feasterville Tavern,

got into the car and started off. As the car was entering the Newtown Road, about ten or twenty feet from where Walter and Kelly were standing, two shots were fired from it and Kelly fell.

According to the statement made by Zietz and his companions to the police shortly after their apprehension within a few hours after the hold up, as Zietz, the driver of the fleeing car, proceeded to drive away, one of his companions said: "Someone is coming out the door." Zeitz then fired two shots with his left hand from the front window of the driver's side in the direction of Kelly, who was from ten to twenty feet away. One of these bullets struck Kelly in the back of his head causing his death on the following day.

The commonwealth offered, over objection, testimony that after leaving the Feasterville Tavern, the defendant and his three companions committed another hold up about five minutes before midnight on the same evening at the Deacon Inn, which lies about eight or thirteen miles from the Feasterville Tavern. This testimony was admitted as showing a plan or system of criminal acts by the defendant and his confederates, and to reveal to the jury the defendant's criminal record so that in the event the jury found him guilty of murder in the first degree the appropriate penalty might be imposed.

The commonwealth offered in evidence an exhibit which purported to be voluntary joint statements or confessions made to the police by Darcy and his companions. These statements related both to the hold up at Feasterville and the subsequent hold up at Deacon Inn. Another exhibit received in evidence consisted of written statements made by the four prisoners purporting to be admissions of the following hold ups which had occurred during the four weeks preceding the one in Feasterville: a hold up at Waterford, New Jersey, on November 30, 1947, another at Maple Shade, New Jersey, on December 3, 1947, and a third at Elkins Park,

Pa., on December 13, 1947. Defendant's counsel objected to these on the ground that the statements were inadmissible under the Act of July 3, 1947, P. L. 1239, §1.

There are twenty-six assignments of error but only a few of them require discussion. The second assignment set forth that the court erred in allowing the jury to be taken to the scene of the crime while the prisoner was remanded on order of the court to the county prison and thus restrained from being present when the jury made its visit. The appellants complain that this action of the trial court violated the due process clause of the Fourteenth Amendment to the United States Constitution, violated the defendant's right to be confronted by the witnesses against him, and violated Article I, Section 9, of the Pennsylvania Constitution.

A stipulation was filed by the District Attorney and by the defendant's counsel as to what took place at the viewing of the Feasterville Inn premises where the robbery and the homicide took place. According to the stipulation, the defendant was conducted back to the county prison at the direction of the court while the jury of fourteen members, the trial judge, the district attorney, the assistant district attorney and the attorney for the defendant viewed the locus of the crime. While there the jury's attention was directed to nine separate objects by the court at the request of the district attorney and defendant's counsel. These objects were specifically: the space directly in front of the fireplace; the change in location of the main entrance to the barroom from a side wall to the front wall of the building; the location of certain other objects, such as, the swinging door behind the bar, the kitchen connected with the barroom, a wall telephone, the radiator, and certain tables; the location of a triangular piece of ground at the intersection of Bustleton Pike and the Churchville Road; and the position of a cardboard in a second story

window in a dwelling house across the street, known as Bustleton Pike.

Under the decisions of the United States Supreme Court and of this Court there was no error in permitting the jury to visit the locus of the crime in the absence of the prisoner. In *Commonwealth v. Westwood*, 324 Pa. 289, 308, we said: "It is established that no right of a defendant is violated when he is not present at a view of the premises where the alleged crime is committed." There is no distinction between the cases in which the defendant was at liberty to attend the viewing and chose not to do so, and those cases in which he was refused permission to attend the viewing. If the right to accompany the jury during a viewing is a fundamental right essential to due process of law, the prisoner cannot waive it [2] any more than he can waive, after pleading "not guilty," the right to be tried by a jury of twelve qualified persons. In the *Westwood* case we said: "In Com. v. Snyder, 185 N. E. 376, the Supreme Judicial Court of Massachusetts held that 'a view is not such a taking of evidence as violates the constitutional right of the defendant to meet the witnesses against him face to face: 3 Wigmore on Evidence (2d Ed.), Section 1803. . . . Defendant's contention that the refusal to grant the motion [that the defendant be allowed to be present at the view] is a violation of article XIV of the Amendments to the Constitution of the United States in that it is a denial of "effective aid in the preparation and trial of a capital case," and therefore is a denial of due process of law, citing Powell v. Alabama, 287 U. S. 45, 53 S. Ct. 55, is unsound, in that the chief purpose of a view is to enable the jury to understand better the testimony which has or may be

---

[2] In felony cases fundamental rights cannot be waived even by the defendant himself: GIBSON, C. J., in *Prine v. Commonwealth*, 18 Pa. 103.

introduced, and because the view is not a part of the trial, it being suspended while the view is taken.' " That case was appealed to the United States Supreme Court, *Snyder v. Massachusetts*, 291 U. S. 97, and that tribunal, in an opinion by Mr. Justice CARDOZO, referring to the absence of a defendant during a view of the locus in quo, said: "If the risk of injustice to the prisoner is shadowy at its greatest, it ceases to be even a shadow when he admits that the jurors were brought to the right place and shown what it was right to see. That in substance is what happened here."

So likewise in the case now before us, the jury was taken to the "right place", and had their attention concentrated on certain constituents of that place whose identification to them would enable them to visualize and understand the testimony they were about to hear. Since it was not error to point out to the jury the whole of the locus in quo, it was not error to point out any part or parts of that whole. The significance of what the jury saw depended entirely on the sworn testimony which they heard in court. For the trial judge to have permitted any testimony to be received, or any discussion to be indulged in, or any argument to be made *during the view*, would have been improper. No testimony was received, no discussion indulged in, and no argument made during that view.

Appellant's counsel, after calling our attention to the fact that the United States Supreme Court in the decision just referred to divided 5 to 4, asks us to reconsider the question of a defendant's right to be present at a viewing. We will do this.

There appears to be a disagreement among the courts of the various states on the question of whether a view of the scene of a murder is a part of the trial. Those which have decided that it is "a part of the trial" seem to think that means that the defendant must be present at the view. Other courts have taken the position that

the view is *not* a part of the trial. We take the position that whether the view *is* considered a part of the trial or *not* a part of the trial, the absence of the defendant from the view, does *not* contravene any of his constitutional rights.

It may be logically argued that viewing the scene of the crime is not a part of the trial. A trial implies a contest of opposing parties in the presence of the judge. There is no contest between the parties when a viewing takes place. The trial judge may or may not be present, as he chooses. Yet there cannot be a judicial trial without a trial judge. The attorneys for the respective parties are usually present but they take no active part. Neither can offer or object to, any evidence, or ask any questions. They must remain passive and mute. The prisoner, if present, must do likewise. The situation is analogous to an agreed-to temporary cessation of hostilities between opposing armies on a battlefield. During the cessation the soldiers of the opposing armies make no hostile move. A flag of truce is in the ascendant and is respected. In one sense the period of cessation of conflict may be considered a part of the battle; in another and stricter sense of the word it is not a part of the battle; the battle is temporarily suspended.[3] So in

---

[3] Chief Justice RUGG in *Commonwealth v. Dascalakis*, 246 Mass. 12, 140 N. E. 470, in discussing this question said: "Its [a view's] chief purpose is to enable the jury to understand better the testimony which has or may be introduced. The essential features may be pointed out by the counsel. No witnesses are heard. . . . The jury can simply use their eyes. . . . A view often dispenses with the necessity of detailed description by plan or word of mouth. Inevitably that which the jury see on a view will be utilized in reaching a verdict. In that sense that which is disclosed on a view is evidence. . . .

"In another more strict and narrow sense a view may be thought not to be evidence. Plainly it is not testimony. It is not given by witnesses. It is not offered in the presence of the judge presiding at the trial. In general, evidence in a jury trial can be given only in the presence of the judge, whose duty it is to be present

viewing the scene of a crime by the jury the trial is temporarily suspended, for there is no clashing of opposing parties or opposing counsel and no offer of evidence or asking of questions.

Even if the view is held to be a part of the trial the appellant cannot complain that his absence from the view was a violation of his constitutional guarantees. Neither the State nor the Federal Constitution declares that an accused must be present at a viewing of the scene of his alleged crime or at every feature of the trial if a viewing is considered a feature of the trial. Section 9 of the State Bill of Rights provides as follows: "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." The 14th Amendment to the Federal Constitution forbids any state depriving any person of "life, liberty, or property without due process of law". For a jury to view the scene of a defendant's alleged crime in his absence does not violate the defendant's right "to meet the witnesses face to face, or to be represented by himself or his counsel". At the viewing there are no witnesses for the

and to be the directing mind over whatever goes on. The place of trial is not changed while the view is being taken. The trial is merely suspended. . . . There are obvious practical objections to the contention that as matter of right a defendant in a criminal case may accompany the jury on a view. The whole subject rests in the sound discretion of the court. That discretion commonly and wisely has been exercised so that the defendant in a criminal case does not accompany the jury on a view."

accused to face. All witnesses against him must take the witness stand and be sworn and confronted by him. The Constitution so requires. Wigmore on Evidence, Third Edition, Vol. 5, Section 1397, says: "There never was at common law any recognized right to an indispensable thing called Confrontation *as distinguished from Cross-examination.* There *was* a right to cross-examination as indispensable, and that right was involved in and secured by confrontation; it was the same right under different names."

The defendant's right of confrontation is not violated by a viewing of the scene of the crime in his absence. Justice CARDOZO, speaking for the United States Supreme Court, said in *Snyder v. Massachusetts,* supra: "We assume in aid of the petitioner that in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. Thus, the privilege to confront one's accusers and cross-examine them face to face is assured to a defendant by the Sixth Amendment in prosecutions in the federal courts (Gaines v. Washington, 277 U. S. 81) and in prosecutions in the state courts is assured very often by the constitutions of the states. For present purposes we assume that the privilege is reinforced by the Fourteenth Amendment, though this has not been squarely held. (Citing cases) . . . the presence of the defendant [at the trial] satisfies the test that was put forward a moment ago as basic and decisive. It bears, or may fairly be assumed to bear, a relation, reasonably substantial, to his opportunity to defend. Nowhere in the decisions of this court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless, or the benefit but a shadow."

The fact that the knowledge gained by the jurors from the viewing of the scene of the crime may have some part in enabling them to reach a verdict does not make it imperative that the defendant be present. There is much other useful knowledge possessed by jurors which may enable them to reach a just verdict, and which may have been acquired long before they were summoned as jurors. One juror may be an expert in ballistics. He may have gained his knowledge by years of study and experience. This knowledge may influence his decision as to the truth or falsity of certain testimony given at the trial as to whether or not the fatal bullet was fired from the defendant's revolver. Is the defendant's right to a fair trial impaired because this knowledge was gained by a juror when defendant was not personally present? Any knowledge which a juror possesses may influence his judgment on any matter submitted to him for decision, just as the knowledge an appellate court judge possesses on a certain subject may influence his decision in a case involving that subject. It may happen that some of the jurors have long resided near the scene of the crime and are entirely familiar with it. Or, it may have happened that several or all of the jurors visited the scene shortly after the crime was committed, as sensational murders often attract people to its locus. By so visiting the scene no one would be disqualified to serve as a juror should he be thereafter summoned as such, nor would he be expected to forget his knowledge of the scene when later it becomes his duty to deliberate upon the guilt of the accused. The fact that a juror gains some knowledge of the case by viewing its locus in defendant's absence gives the latter no cause for complaint, for the simple and obvious reason that the defendant's mute presence at the scene when the juror gained his knowledge could not have affected in the slightest degree the latter's

acquisition of knowledge. "Reason is the life of the law", said Sir Edward Coke.

It would be carrying adherence to the strict letter of constitutional safeguards to absurd lengths to hold that the absence of a defendant from the scene of an alleged crime at a time when the jury was viewing the scene, and without any suggestions or questions from anybody, violates any constitutional safeguard possessed by the defendant. There would be far more reason to hold that to permit a witness to repeat in court an alleged "dying declaration" of the defendant's victim violated the rights of the defendant to "confront" his accusers, yet the courts have uniformly held that the admission of "dying declarations" do not violate any constitutional right of the accused. Wigmore on Evidence, Third Edition, Volume 5, Section 1398, says: "The use of *dying declarations* has been thus passed upon, and without any dissenting rulings." Citing *Mattox v. U. S.*, 156 U. S. 237, and cases from twenty other American jurisdictions. See also *Com. v. Mika*, 171 Pa. 273, 33 A. 65.

The knowledge which the jurors acquire when inspecting the scene of the crime is characterized by some judges as "evidence in the case". It is no more evidence in this case than any other knowledge jurors may possess which enables them to pass fairly on the testimony heard by them. Ignorance of everything except the facts testified to by witnesses in the case on trial is not a constitutionally required qualification of American jurors.

It has also been said that "a view of the premises where the crime was alleged to have been committed is a part of the process of submission of data to the triers of fact, upon which judgment is to be founded". It could be as reasonably argued that if the jurors while being taken in automobiles for an "airing" after the close of a day's session happened to pass by the scene of the crime, and saw, for example, the tree behind

which the defendant was alleged to have stood when he fired the bullet at his victim, the defendant was prejudiced because he was not in the jurors' company. If during the trial of a defendant for murder the jurors should find a dictionary in the jury room and ascertain from it the meaning of some unfamiliar words spoken from the witness stand, it could not reasonably be held that the defendant was prejudiced because he was not present when the jurors were consulting the dictionary.

It would be carrying technicalities to fantastic lengths to hold that for a jury to view passively the scene of a murder without the defendant being present violated the latter's constitutional rights. Such a holding would justify the reproach which William H. Taft cast upon the administration of criminal law in this country when in an address at Yale Law School on June 26, 1905, 15 Yale L. J. 1, he said that "courts of appeal [have been led] to a degree of refinement in upholding technicalities in favor of defendants, and in reversing convictions that render one who has had practical knowledge of the trial of criminal cases most impatient." In *Snyder v. Massachusetts,* supra, Justice CARDOZO sensibly says about a jury's viewing the scene of a crime: "The Fourteenth Amendment does not assure to a defendant the privilege to be present at such a time. There is nothing he could do if he were there, and almost nothing he could gain. The only shred of advantage would be to make certain that the jury had been brought to the right place and had viewed the right scene. If he felt any doubt about this, he could examine the bailiffs at the trial and learn what they had looked at. . . . If the bailiffs were to bear false witness as to the place they had shown, the lie would be known to the jury. There is no immutable principle of justice that secures protection to a defendant against so shadowy a risk."

It is a maxim in the interpretation of statutes that "All laws should receive a sensible construction", and

that "General terms should be so limited in their application so as not to lead to . . . an absurd consequence". (See cases cited in *Watson v. Witkin et al.*, 343 Pa. 1, 6.) For nineteen centuries judges as well as others have shown respect for the saying, "The letter killeth but the spirit giveth life" (2 Corinthians 3:6). The foregoing applies to constitutional provisions as well as to statutes.

Even at a trial there is permitted certain departures from the strict letter of the constitutional guarantee of confrontation of witnesses; for example, "dying declarations" are admitted in evidence although the declarant is not there for the accused to confront; certain res gestae declarations are also admitted in evidence although the declarant is not present to be faced by the accused. While the constitution declares that "No person shall, for the same offense, be twice put in jeopardy", nevertheless, courts have permitted a jury which had failed to agree on a verdict to be discharged for reasons which the trial judge deemed adequate, such as, the sickness of a juror. In *Commonwealth v. Kent*, 355 Pa. 146, 49 A. 2d 388, we said: "There are many exceptions to the general statement [constitutional guarantee] that a person once in jeopardy may not again be put in jeopardy for the same offense. See Com. v. Cook, 6 S. & R. 577, 579 (1822). . . ." To hold that a defendant has no right to be present when the jury visits the scene of the crime in his absence does not require any departure from the strict letter of any of his constitutional guarantees.[4]

_____

[4] In the historic case of *Ex parte Milligan*, 4 Wall 2, Jeremiah S. Black in his argument "In Defense of the Right to Trial by Jury", enumerated twelve groups of constitutional safeguards which every accused possesses when he is subjected to the administration of punitive justice. Of these twelve, the only safeguards applicable to the question now before us are these: "(9) The trial shall be public and open, that no underhand advantage may be taken. The party

The decisions of this Court on this question have all been consistent and in accord with the decisions of the highest courts in many other jurisdictions and with the conclusions of accepted legal commentators. This Court, in *Commonwealth v. Van Horn*, 188 Pa. 143, 160, 41 A. 469, declared that: "No right of the defendant [in a murder case] was in any degree impaired or affected by the mere fact of the view [in the defendant's absence]. It served to make the testimony more intelligible to the jury, but that is not impairing a constitutional right in any conceivable sense. The very point now made was before us in the case of Com. v. Salyards, 158 Pa. 501. It was an indictment for murder, and on the trial the court sent the jury to view the ground and premises in the absence of the prisoner and his counsel. This was assigned for error, but we sustained the judgment in a brief per curiam opinion. . . ."

In *Commonwealth v. Kosh*, 305 Pa. 146, 157 A. 479, the jurors in a first degree murder case were conducted with the judge and the officers of the court to view the scene of the crime, and were taken in parties of four to view a basement while the rest stood within sound and view on the steps leading to the basement. It was held that the jury's viewing of the premises in the absence of the defendant, and the separation of the jury into groups of four to visit the basement, which separation

---

shall be confronted with the witnesses against him, have compulsory process for his own witnesses, and be entitled to the assistance of counsel in his defense."

These safeguards were given the accused. When the jury viewed the scene in his absence, there were no witnesses there for him to confront. He, therefore, cannot complain of any invasion of his constitutional right. The above safeguards (#9) were made a part of our organic law to insure an accused against "starchamber proceedings" (See IV Blackstone, 267). The accused in the case now before us was not subject to any such proceedings.

was unavoidable to permit them all to visit that portion of the building, was not error.

In the well known case of *Com. v. Webster*, 5 Cush. 296, Chief Justice SHAW entertained no doubt that he had authority to grant a view of the locus of the crime, and he directed that the jury should be permitted to view the medical college where the murder was committed, attended by two officers and one counsel on each side. The accused was not present at the view. In *People v. Thorn*, 156 N. Y. 286, 50 N. E. 947, a capital case, the Court of Appeals of New York held that a view, by the jury in a criminal case, of the premises where the crime was committed, is not a part of the trial, nor the taking of evidence. The Court of Appeals said: "It cannot be seriously doubted that evidence can only be delivered to a jury in a criminal case in open court, and, unless there is a judge or judges present, there can be no court. The statute does not intend that the judge shall accompany the jury on a tour of inspection. This is so obvious that discussion could not make it more plain. . . . It is the duty of the jurors to view the premises, not to receive evidence, and nothing could be done by the defendant, or by his counsel, if they were present; so their presence could not benefit him in any way, nor their absence prejudice him." [5]

In *State v. Suber*, 71 S. E. 466, the Supreme Court of South Carolina held in a murder case in which defendant was convicted that, "The principles we deduce from the authorities are (1) that in a constitutional sense, the viewing of the premises by the jury is not

---

[5] In the case of *People v. Court of Oyer & Terminer*, 101 N. Y. 245, 4 N. E. 259, one of the jurors, during the progress of a trial of an indictment for assault with intent to kill, went to the scene of the affray for the purpose of acquainting himself with the locality. For this act he was adjudged guilty of contempt of court, and was committed. The Court of Appeals of New York reversed the conviction upon the ground that no contempt had been shown.

the taking of testimony; (2) that the prisoner is not thereby deprived of the right to confront or cross-examine any witness in the case; and (3) that it cannot reasonably be supposed that the prisoner's rights would in any respect be prejudiced by the absence of any judge, if the jury merely inspected the locality." See also *State v. Mortensen*, 26 Utah, 312, 73 Pac. 562.

Greenleaf in his Law of Evidence, Volume 1, §162, subd. 4, in discussing the question whether the defendant has a constitutional right to be present at the view, says: "The requirement of confrontation implies merely, that the party shall have the opportunity of cross-examining witnesses; and a view by the jury is not the consultation of witnesses but merely the inspection of the thing itself which is the subject of the controversy; so that the constitutional principle cannot properly apply to render improper a view at which the accused is not present."

Wigmore, Third Edition, Vol. VI, Section 1803, p. 252, says: "As to the argument that the jury's view is a part of the trial and that the accused is entitled to be present at every part of the trial, the answer is that the accused might equally well claim to be present at the jury's deliberations over their verdict, for that is equally a part of the trial; if there is no inherent and invariable necessity for that part, neither is there for this. As for the related suggestion that the holding of a view in the absence of the defendant is the holding of a part of the trial 'away from the place appointed for the holding of the court,' it would follow from this that the judge and other court officers should be present also; but no one has ever supposed this necessary."

There are cases where it is *not* essential to a proper understanding of the evidence to have the jury visit the locus of the crime. There are cases where it *is* essential. Whether the jury should be permitted to do so is a matter within the discretion of the trial judge. There

are hazards involved in taking a prisoner to the scene of his crime, which may be very distant from the court-room. If his crime was of a particularly atrocious character, an attempt may be made to lynch him. There is also danger of the prisoner escaping or of members of his gang making an armed attempt to take him from custody.[6] Why incur such risks for such futility?

In the instant case no error can be predicated on the jury's viewing of the scene of the crime in the absence of the defendant.

Appellant complains also that the trial judge committed error when after defining common law robbery, he quoted to the jury section 704 of the Act of June 24, 1939, P. L. 872, 18 PS 4704, without thereafter explaining that the term "robbery" as used in the first degree murder statute means common law robbery. Section 704, supra, which is a substantial reënactment of section 102 of the Act of March 31, 1860, P. L. 382, except for the penalty provisions, does not define robbery, but provides for the punishment of it and other offenses akin to robbery which contain some but not all of the elements of robbery as it was known to the common law. See Trickett, Criminal Law, Vol. 2, p. 661; *Acker v. Com.*, 94 Pa. 284; *Com. v. Dantine*, 261 Pa. 496; and *Com. v. Anagustov*, 82 Pa. Superior Ct. 156. In the latter case the Superior Court said: "The section [704 of the Act of June 24, 1939, supra] under which the indictment was drawn does not define robbery. We are remitted

---

[6] On June 17, 1933, there occurred "The Kansas City Massacre" in Union Station Plaza, in that city. Four F.B.I. men and the Chief of Police of McAlester, Oklahoma, and two Kansas City, Missouri, policemen, were transferring a convict, Frank "Jelly" Nash from a train to a parked automobile. As the prisoner and some of the officers were about to enter the car three desperadoes, Verne Miller, Adam Richetti, and "Pretty Boy" Floyd, opened fire upon the group at a distance of about eighteen feet, with a machine gun and other weapons. Four of the officers were instantly killed and another officer very severely wounded. The convict also was killed.

therefore to the common law definition of the offense . . . There can be no robbery without an assault or putting in fear." In *Commonwealth v. Dantine,* 261 Pa. 496, 498, 104 A. 672, this Court held: "While it [robbery] is the felonious and forcible taking from the person of another of goods or money to any value by violence or putting in fear, the offense is complete if they are taken in the presence of the owner by violence or putting in fear." Whether a homicide committed in the perpetration of any one of the statutory felonies prescribed by section 704 of The Penal Code is murder in the first degree need not now be decided.

It was unnecessary for the court to quote section 704. However, to do so was not prejudicial error. Had there been an issue raised at the trial as to whether the appellant has committed a common law robbery or merely one of the statutory offenses proscribed in section 704, there would be some substance to appellant's complaint. But no such issue was raised. The evidence as to the commission of common law robbery by defendant was neither contested nor contestable. When Foster upon entering the Feasterville Tavern in criminal concert with Darcy and Zietz, went behind the bar, pointed his gun and said: "This is a stick up. Get 'em up", he and they thereby publicly proclaimed, in effect, that they were engaging in a common law robbery; that is, in forcibly and feloniously taking from the person or presence of another money or goods of any value by means of violence or putting that other person in fear. Both the defendant and his confederates made statements admitting that they entered the tavern for the purpose of committing violent robbery. Under this evidence for a jury not to have found that these men were engaged in a common law robbery would have been perverse. The offense of robbery as it was known in the common law (4 Blackstone 242) and as it has been known to lawyers and laymen is so easily recognized that it seldom

if ever requires formal definition. While in a trial of a defendant charged with murder in perpetrating or attempting to perpetrate a robbery or any of the other felonies enumerated in the Act of June 24, 1939, P. L. 872, 18 PS 4704, it is the better practice for the trial judge to define those crimes, the omission to do so is not error when there is no issue raised as to the commission of the felony on which the charge of murder in the first degree is based and where its commission appears incontrovertible from the evidence.

In *Commonwealth v. Riggs,* 313 Pa. 457, 461, 169 A. 896, complaint was made that the court failed to define robbery. The appellant in that case had entered a store and told the manager to "stick 'em up". He signed a confession in which he admitted participation in the attempted robbery, in the course of which he shot and killed an officer. In an opinion by Mr. Justice LINN this Court stated: "If defendant had suggested, in defense, that he and Skawinski were not engaged in attempting to rob, there might be merit in the objection; but he frankly testified that they went into the store for the express purpose of committing a robbery. We do not say that, in homicide resulting in the perpetration of felonies, as described in the statute, the court need never define the felony; as the case was presented by both sides, there was not, and could not be, any dispute about defendant's purpose: Com. v. Manfredi, 162 Pa. 144, 148, 29 A. 404. Indeed, this was so clear that no point was made of it in the court below; no additional instructions were requested, and the alleged omission was not made the subject of particular exception. See Com. v. Caraffa, 222 Pa. 297, 71 A. 17; Com. v. Pacito, 229 Pa. 328, 78 A. 828; Com. v. Varano, 258 Pa. 442. 102 A. 131." See *Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518, in which the defendant was charged with murder in the perpetration of arson and in which

case the court "did not define arson in technical terminology".

The trial judge at the close of his charge asked counsel whether he had overlooked anything. Defendant's counsel replied in the negative. "Where the court's charge substantially covers the points in dispute, and no further requests for charge are made by defendant's counsel, although opportunity for such is given, defendant cannot on appeal complain of the inadequacy of the charge without showing that the alleged omissions contributed to the jury's verdict to defendant's prejudice: Com. v. Pacito, 229 Pa. 328; Com. v. Varano, 258 Pa. 442; Com. v. Winter, 289 Pa. 284; Com. v. Mendola, 294 Pa. 353. Nothing of the kind appears here.": *Commonwealth v. Bruno,* supra.

Appellant's 18th Assignment of Error was based on the following excerpt from the charge of the court: "One who uses a deadly weapon upon another at some vital part with a manifest intention to use it upon him, must in the absence of qualifying facts be presumed to know that his act is likely to kill, and knowing this, must be presumed to intend death, which is the probable and ordinary consequence of such an act. Furthermore, when one so uses a deadly weapon upon another without sufficient cause or provocation, he must be presumed to do it wickedly or from a bad heart." In support of this Assignment of Error the Appellant says: "The most logical inference from this evidence is that the shot was fired with the intent to ward off pursuit by a display of force rather than with the intent to kill or even wound any one."

The foregoing argument answers itself by the statement that the shot was fired "with the intent to ward off pursuit." In *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313, there was proof of the common purpose of several bandits to take by force the money of a bank and while the conspirators all tried to effect their escape an

accomplice of the defendant Doris shot and killed the deceased. It was held that a verdict of murder in the first degree was justified. In that case we cited the following from *Commonwealth v. Lawrence,* 282 Pa. 128, 132: "Though the forcible stealing technically may be complete, if the homicide is committed while the actor is engaged in one of the elements incident to the crime, as, for illustration, an escape or flight, the killing is referable to the robbery."

We said in *Commonwealth v. Kelly,* 337 Pa. 171, 175, 10 A. 2d 431: "It is a legitimate assumption that one who plans a robbery or burglary and by an overt act attempts to carry it out has also planned to escape from the scene of his crime. He must intend to make his felonious venture successful and it cannot be successful until he has made his escape." We also said: "The jury was justified in finding that Kelly's shooting of an officer in order to effectuate his flight from the scene of his attempted robbery was so identified with that initial crime as to make the homicide one committed in the attempted perpetration of the felony of robbery."

The same principle applies to the instant case. There is no doubt that the victim of this homicide was shot while the robbers were attempting to escape with their plunder from the scene of the crime, and the fatal shot was fired to discourage pursuit.

Appellant also attempts to predicate error upon the admission by the court of evidence that thirty minutes after the robbery was committed at the Feasterville Tavern the same group, to wit, Darcy, Foster, Zietz and Capone, robbed the proprietor and patrons of the Deacon Inn with a display of guns, at a point about 8 or 13 miles distant by automobile (depending upon the route traveled) from the first named tavern. The District Attorney offered this evidence for the following purpose: "1. To show identity. 2. To show that the hold-up at the

Deacon Inn had been performed in the same general method as the hold-up at the Feasterville Tavern. 3. To establish a course of conduct. 4. To fix the presence of Darcy and his companions at or near the scene of the Feasterville Tavern hold-up. 5. To furnish the jury with evidence to be considered in connection with possible punishment." There is no error in the reception of this evidence. It is always permissible to show that a defendant and his confederates in a murder case have entered upon a plan or a system for the commission of murder and related felonies. Proof that they did so is relevant to the issue raised of the guilt of the crime specifically charged in the indictment on which they are tried.

In *Commonwealth v. Strantz,* 328 Pa. 33, 195 A. 75, this Court held that evidence of other crimes, committed before or after the specific crime charged, is competent to prove the crime charged when it tends to establish a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other. In that case we referred to the case of *Hester v. Com.,* 85 Pa. 139, 156, where it was held that certain evidence was properly admissible where "Its purpose was to explain the relations existing between the conspirators, the reason, motive and opportunity for their combined action, and *the nature of the tie that bound them together* [italics supplied]." [7]

The appellant also invokes the Act of July 3, 1947, P. L. 1239, 19 PS 711, as excluding at the trial, evidence of other crimes. As we have this day in the case of *Commonwealth v. DePofi* adjudged the Act of 1947 un-

---

[7] One of the men, Lewis Payne, hanged for the murder of Abraham Lincoln was adjudged by inference guilty of that murder as a co-conspirator with Booth, largely because on the same evening President Lincoln was shot, he, Payne, a close associate of Booth's, made a murderous assault on Secretary of State Seward at the latter's residence.

constitutional that Act was no bar to the evidence complained of. However, as we have pointed out, the evidence of the other crimes possessed relevancy independent of the question of fixing the appropriate penalty and therefore the Act of 1947 even if operative would not bar that evidence.

The other Assignments of Error do not require discussion. All of them are overruled.

The judgment is affirmed and the record is remitted to the court below so that sentence imposed may be executed.

DISSENTING OPINION BY MR. JUSTICE JONES:

The appellant raises, among other questions, the validity of the Act of July 3, 1947, P. L. 1239, amending the Act of March 15, 1911, P. L. 20, also present in the case of *Commonwealth v. DePofi*, which was reargued by order of this court along with this appeal. I found the appellant's paper book on this appeal particularly helpful on the question of the Act of 1947 but incorporated my views in a dissent to the majority opinion in the *DePofi* case, filed this day. For the reasons given in that dissent, I would reverse the judgment of sentence and remand the case for a new trial. Any discussion of the appellant's other contentions is, therefore, unnecessary here.