**UNITED STATES ex rel. DARCY v. HANDY, Warden, et al.**

**No. 10447.**

United States Court of Appeals
Third Circuit.

Argued Jan. 7, 1952.

Reargued Dec. 1, 1952.

Decided March 24, 1953.

As Amended March 28, 1953.

Rehearing Denied April 29, 1953.

Charles J. Margiotti, Pittsburgh, Pa., (J. Dress Pannell, Harrisburg, Pa., Morton Witkin, Philadelphia, Pa., on the brief), for appellant.

Randolph C. Ryder, Deputy Atty. Gen. of Pa., (Donald W. VanArtzdalen, Asst. Dist. Atty., and Willard S. Curtin, Dist. Atty., Doylestown, Pa., Robert ☐. Woodside, Atty. Gen., of Pa., on the brief), for appellees.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

## PER CURIAM.

The majority of the court is of the opinion that the relator must be afforded the opportunity to prove the allegations set out in his petition for habeas corpus insofar as they relate to the alleged atmosphere of hysteria and prejudice prevailing at his trial, including any issues raised by Judge Boyer's asserted visits to the courtroom during Darcy's trial, since the undisputed and incontrovertible facts as shown by the record do not countervail the allegations of hysteria and prejudice. See Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 85 L.Ed. 830.

The court has considered the allegations of the petition concerning the conduct of Darcy's counsel and the entire record upon this issue. It is the opinion of a majority of the court that the District Court was justified in deciding against the petitioner on this issue without taking testimony.

All members of the court are of the opinion that the affidavits of members of the jury must be stricken from the relator's petition.

The respective views of the members of the court are set out in the opinions which follow this per curiam opinion.

The judgment of the court below will be reversed with the direction to enter an order staying Darcy's execution until the disposition by the court below of the instant case on remand on the issue of alleged hysteria and prejudice. The court below will be directed to strike from the petition for habeas corpus the jurors' letters attached thereto. The stay order entered by this court will be vacated.

BIGGS, Chief Judge.

The question presented by the instant case is whether the Commonwealth of Pennsylvania denied to the relator, Darcy, due process of law as guaranteed to him by the Fourteenth Amendment during his trial for first degree murder. Darcy was charged with murder in the first degree because a bystander, Kelly, was shot and killed by one of Darcy's companions in the course of the armed robbery of the Feasterville Tavern, near Doylestown, Pennsylvania. Two of Darcy's co-actors in the robbery, Foster and Zeitz, were tried just before Darcy by the same court which later tried him. Foster and Zeitz were found guilty of first degree murder and the penalty was fixed at death. Darcy also was found guilty of first degree murder and was sentenced to death.

A history of the proceedings prior to this appeal follows. Darcy was tried, convicted and sentenced in the Court of Oyer and Terminer of Bucks County, Pennsylvania, at No. 37 February Term 1948. A petition for a new trial was filed and was denied by that court, Darcy's conviction and sentence being affirmed. An appeal was taken to the Supreme Court of Pennsylvania and the judgment of the court below was affirmed, Mr. Justice Jones dissenting. See Commonwealth v. Darcy, 362 Pa. 259, 66 A.2d 663. An application for certiorari to the Supreme Court of the United States was denied. See 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528.

Darcy next filed a petition for habeas corpus to the Supreme Court of Pennsylvania. This was the first petition for habeas corpus filed to the Supreme Court of Pennsylvania. It was denied without opinion. An application for certiorari to the Supreme Court of the United States was denied. See 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528.

Darcy then applied to the Supreme Court of Pennsylvania for certiorari to the Court of Oyer & Terminer of Bucks County and for reargument *nunc pro tunc*. In this application Darcy raised all the grounds set forth in his instant petition save one, viz., that Darcy's counsel would not permit him to take the stand. The application was denied by the Supreme Court of Pennsylvania without opinion. The relator did not apply for certiorari to the Supreme Court of the United States from this denial.

On the same day on which Darcy's petition to the Supreme Court of Pennsylvania for certiorari to the Court of Oyer & Terminer of Bucks County and for reargument *nunc pro tunc* was denied by the Supreme Court of Pennsylvania, Darcy filed his petition for habeas corpus in the court below.

The petition came on for hearing on April 5, 1951, on an order so directing[1] which also stayed Darcy's execution until the final disposition of the petition by the court below. The Commonwealth moved orally to dismiss the petition as insufficient in law. Leave to file an answer *nunc pro tunc* was granted to the Commonwealth and an answer was received by the Clerk on April 17, 1951 and was filed by him as of April 3. It will be noted that the answer was filed six days after the court below entered its final order.

The grounds raised by the petition for habeas corpus filed in the court below were not set up in the first petition for habeas corpus filed to the Supreme Court of Pennsylvania. Because of this the court below further stayed Darcy's execution[2] but indicated that it would have to dismiss the petition because Darcy had not exhausted his State remedy. The court below, however, retained jurisdiction of the cause purportedly to permit Darcy to exhaust his State remedy by filing a new, a second, petition for habeas corpus to the Supreme Court of Pennsylvania, setting up all the grounds raised by the instant petition. The Supreme Court of Pennsylvania denied the

1. This order entered by Judge Follmer on April 3, 1951, was, in effect, a rule to show cause.

2. On April 5, 1951, the court below continued the stay of execution, theretofore granted by it, until 10:00 A. M., Tuesday, April 10, 1951, stating that if the Supreme Court of Pennsylvania did not grant a stay of execution it would be necessary for further application to be made to the court below if the stay order was to be continued in effect.

second petition for habeas corpus filed to it, *sub nom.* Commonwealth ex rel. Darcy v. Claudy, 367 Pa. 130, 79 A.2d 785, passing on every substantial ground alleged in the petition.

The instant case then came on for further hearing on April 10 and 11, 1951. Darcy moved orally in the alternative for (1) the writ, or (2) for an additional stay pending application by him to the Supreme Court of the United States for certiorari. On April 11, 1951, the court below dismissed the petition, pointing out that by the terms of the orders the stay of execution was at an end. The order of dismissal included a provision denying any further stay of execution. The court below filed an opinion reported *sub nom.* United States ex rel. Darcy v. Handy, D.C., 97 F.Supp. 930. At the time of the hearing of April 10 and 11 Darcy, as indicated, had not yet applied to the Supreme Court of the United States for certiorari from the denial by the Supreme Court of Pennsylvania of the second petition for habeas corpus. After the dismissal of the petition and the denial of further stay by the court below application for certiorari was made to the Supreme Court of the United States and the application was denied. See Com. of Pennsylvania ex rel. Darcy v. Claudy, 342 U.S. 837, 72 S.Ct. 61, 96 L.Ed. 632. Darcy meanwhile had appealed to this court.[3]

While it is clear that the court below denied any further stay and dismissed the petition, the route by which the court below reached its final conclusion is not entirely certain. As has been said the court below issued an order in the nature of a rule to show cause on the petition[4] and a motion to dismiss the petition as insufficient in law was made orally by the Commonwealth. The court below at this point apparently was following the technique laid down by the Supreme Court of the United States by Mr. Justice Roberts, in Walker v. Johnston, 312 U.S. 275, 284, 61 S.Ct. 574, 578, 85 L.Ed. 830. Mr. Justice Roberts

stated that "* * * if, upon the face of the petition, it appears that the party is not entitled to the writ, the court may refuse to issue it. Since the allegations of such petitions are often inconclusive, the practice has grown up of issuing an order to show cause, which the respondent may answer. By this procedure the facts on which the opposing parties rely may be exhibited, and the court may find that no issue of fact is involved. In this way useless grant of the writ with consequent production of the prisoner and of witnesses may be avoided where from undisputed facts or from incontrovertible facts, such as those recited in a court record, it appears, as a matter of law, no cause for granting the writ exists. On the other hand, on the facts admitted, it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge. This practice has long been followed by this court * * * and by the lower courts. * * * It is a convenient one, deprives the petitioner of no substantial right, if the petition and traverse are treated, as we think they should be, as together constituting the application for the writ, and the return to the rule as setting up the facts thought to warrant its denial, and if issues of fact emerging from the pleadings are tried as required by the statute."

■■ It will be observed that under the ruling of Walker v. Johnston in order to dismiss a petition for habeas corpus on a rule to show cause there must be no substantial issue of fact involved and undisputed and incontrovertible facts must afford an insufficient basis for the legal relief sought. We adhered to this view in the case of United States ex rel. Master v. Baldi, 3 Cir., 198 F.2d 113. The court below in the instant case at the instance of the Commonwealth, received in evidence, at the time of the first hearing, April 5, 1951, the transcript of the proceedings of Darcy's trial in the Court of Oyer and Terminer and numerous other records relating to the ap-

---

**3.** This court by its order of April 11, 1951, stayed the execution of Darcy, "pending the hearing and determination by the Court of the appeal in the above entitled case."

**4.** See Order of Judge Follmer filed April 3, 1951, and the order of Chief Judge Watson and Judge Murphy filed April 5, 1951.

peals to the Supreme Court of Pennsylvania and to the Supreme Court of the United States and the various applications and petitions filed to those courts. These documents were properly received in evidence as pertinent both to the issue of exhaustion of State remedy by Darcy and in relation to the allegations of the petition to the issue of whether Darcy had been denied due process of law. See our decision in United States ex rel. Master v. Baldi, supra. But the court below, as will be pointed out in more detail hereinafter, treated the matters contained in the transcript of the proceedings of Darcy's trial in the Court of Oyer and Terminer as contradicting completely the allegations of the petition when in fact the record of the proceedings cannot be construed properly to have such an effect. The petition contains allegations not met by the record of the proceedings in the Court of Oyer and Terminer. The court below committed reversible error in this respect.

■ The first part of the opinion of the court below, 97 F.Supp. at pages 932–934, advances a number of grounds why the writ and the stay were denied. The principal reasons explicitly advanced were that there were no extraordinary circumstances of peculiar urgency which required the issuance of the writ,[5] that a further stay would have made void under 28 U.S.C. § 2251, the proceedings against Darcy in the State Court, and that the issuance of the writ would have disturbed needlessly that delicate balance of power which must be maintained between the State and Federal sovereigns. At the time the final order was entered in the case, April 11, 1951, and at the time the opinion was handed down by the court below, May 17, 1951,[6] Darcy, as has been said, had not yet applied to the Supreme Court of the United States for certiorari from the order denying the second petition for habeas corpus filed to the Supreme Court of Pennsylvania. The application for certiorari was made on June 12, 1951, and the Supreme Court denied

certiorari on October 8, 1951. It is clear therefore that at all times when the case was before the court below Darcy had not exhausted his State remedy. See Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L. Ed. 761. No explicit reference is made to this fact in the opinion of the court below and it is not clear that this was a deciding or a potent factor in causing the court to refuse to grant either the writ or the stay. But it should be noted that the court in its opinion, 97 F.Supp. at page 934, quoting from Morgan v. Horrall, 9 Cir., 175 F.2d 404, 407, said: " 'If some rational balance is to be preserved in the matter of handling petitions for writs of habeas corpus in Federal District Courts it is proper that petitioners should be required to exhaust available remedies under the present liberal procedure which seems wholly adequate to meet a situation of the character here presented.' " It is probable that this quotation was intended by the court below to support the proposition that Darcy had not secured a stay of execution from either the Supreme Court of Pennsylvania or from the Supreme Court of the United States on the presentation of his second petition for habeas corpus to the Supreme Court of Pennsylvania. The reference, however, may be directed to the fact that when the instant case was before the court below on April 10 and 11, Darcy had not made an application for certiorari to the Supreme Court of the United States from the denial of his second petition for habeas corpus to the Supreme Court of Pennsylvania. Having decided, however, for the reasons thus stated or implied in the first part of its opinion, 97 F.Supp. at pages 932–934, the court below then stated, mid-opinion: "For the foregoing reasons, we refused to grant either the writ or the stay."

■ The court then went on to say: "What of the motion to dismiss?", and quoted from the concurring opinion in United States ex rel. Auld v. Warden, 3 Cir., 187 F.2d 615, 621, as follows: " '* * * judicial power to dismiss a petition on its

---

5. The court below cited the decision of this court in United States ex rel. Auld v. Warden, 3 Cir., 187 F.2d 615.

6. The opinion was filed above five weeks after the court entered its final order. Naturally, some time was consumed in preparing this lengthy opinion.

merits is not destroyed by the statutory limitation on the granting of affirmative relief.'" See 97 F.Supp. at pages 934–935. The court below seemingly construed the words just quoted to the effect that if a United States district court cannot grant the relief sought by a petition for habeas corpus or even entertain it because it is insufficient in law it nonetheless possesses the jurisdiction, the power, to dismiss the petition. This doctrine is sound, of course, but inherent in its application is the principle that the grounds alleged in the petition, viewed in the light of the undisputed or incontrovertible facts shown by the record of the proceedings in the State trial court, must be insufficient in law to afford the relief sought by the petitioner.

The court below concluded its opinion by stating, 97 F.Supp. at page 942: "Since it appears that petitioner is not entitled to a writ and that his petition is without merit * * * we have no alternative but to dismiss." It would appear from the opinion and from the transcript of the record of the proceedings before the court below on April 5, 10 and 11, 1951, that the court below was basing its final conclusions on the position that the allegations of the petition were improbable and unbelievable in the light of the record of Darcy's trial in the Court of Oyer and Terminer, as contended by the Commonwealth. But the undisputed and incontrovertible facts demonstrated by the Oyer and Terminer record do not contradict some of the pertinent allegations of the petition as will be shown hereinafter. The court below erroneously believing that the uncontrovertible and undisputed facts showed that Darcy was not entitled to the relief sought dismissed the petition without affording petitioner the opportunity to support the allegations by evidence. The court below seemed to be of the view that it was proceeding strictly in accordance with the rubric of Walker v. Johnston, but it was not. See 97 F.Supp. at page 941. The entire picture is rendered all the more cloudy and obscure because the court below seemed to be proceeding, at least to some degree and on occasion as if upon final hearing.[7] It is desirable to repeat here the language of Mr. Justice Roberts in Walker v. Johnston, 312 U.S. at page 287, 61 S.Ct. at page 579: "The Government's contention that his [the petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence. On this record it is his right to be heard." It is necessary therefore to analyze briefly the petition for habeas corpus and the record of the proceedings of the Court of Oyer and Terminer filed in the instant case.

The allegations of the petition may be summed up as follows: (1) that the relator was tried in an atmosphere of hysteria and prejudice, the newspapers in the vicinity by their accounts of the crime and of the trials, including that of Foster and Zeitz, having rendered the impaneling of a fair and impartial jury impossible, Darcy having been put to his trial almost immediately after that of Foster and Zeitz, the judge at the earlier trial, who allegedly had already demonstrated prejudice against all the robbers, having appeared on the bench during Darcy's trial making a comment adverse to Darcy on a critical issue of evidentiary law, and apparently participating in the consideration of the ruling made immediately thereafter adverse to Darcy's position;[8] and (2) that Darcy was defended by counsel so lacking in diligence and

7. The matter assuredly is not clear of doubt. At the hearing of April 10 before the court below, counsel for Darcy stated: "If the Court please, I did not come prepared to argue on the merits." The court replied, "That is what this hearing is for, sir, the merits of whether or not there should be a continuance of the stay order and whether or not we should entertain that petition." Transcript of the hearing before the court below of April 10, 1951, at p. 88. See also id., pp. 81, 83–4, and 88–9. The transcript as a whole does not present a clear-cut picture as to whether the court was proceeding solely on Darcy's application for a further stay of execution or whether the extended argument and colloquy were directed to the entire relief sought by the petition, viz., the issuance of a writ of habeas corpus. But it is clear that the court denied the writ, denied a further stay and dismissed the petition.

8. The circumstances attendant upon this incident, as alleged in the petition and as appears from the record, are as fol-

competency[9] that his trial was no trial at all, no change of venue having been requested and Darcy not having been permitted to testify in his own defense or to call witnesses as to his "background, personal history, mental condition, prior good behavior, character and reputation. * * *"

Some of the allegations of the petition—those which are referred to specifically in item "(1)" of the foregoing par-

---

lows. Foster and Zeitz, co-actors with Darcy in the crime, were found guilty of first degree murder, the jury fixing the penalty at death. The Foster and Zeitz trial was concluded on Friday, June 4, 1948. After the jury had returned its verdict Judge Calvin S. Boyer praised its members, stating according to the Doylestown Daily Intelligencer, "I don't see how you could, under the evidence, have reached any other verdict. Your verdict may have a very wholesome effect on other young men in all vicinities who may come to realize the seriousness of the folly in which so many young men indulge these days. The only hope of stemming the tide of crime by youth is to impose the law which you have indicated by your decision."

The selection of the Darcy jury commenced on Monday, June 7, 1948, before President Judge Hiram C. Keller and continued through Tuesday, June 8. The Commonwealth's case was opened on Wednesday, June 9, and the Darcy trial was concluded on Monday, June 14. On June 12, Judge Boyer sentenced a young man, White, from Philadelphia, who had pleaded guilty to larceny. It is alleged by Darcy that, according to the Doylestown Daily Intelligencer, Judge Boyer berated White for coming from Philadelphia to Bucks County and engaging in theft. Darcy's petition alleges that Judge Boyer stated in sentencing White: "We don't propose to nail all our property fast here in Bucks County just because thieves from Philadelphia want to pick up everything which isn't being watched. What business did you have to come up here in the first place? So far as your testimony is concerned you have not shown any excuse here at all to come out of Philadelphia to Bucks County." Darcy came from Philadelphia.

It is not clear from the record whether the members of Darcy's jury were segregated or were prohibited from reading newspapers during the course of the Darcy trial. The crime which Darcy and his associates had committed was a brutal and notorious one. There is no doubt that great animosity was stirred in the minds of persons in the vicinage by reason of the armed robbery and the murder of Kelly and that feeling ran high.

In addition to the foregoing there is another element to be considered. As has been indicated in the body of this opinion, Judge Boyer not only came into the courtroom during the course of Darcy's trial; he also ascended the bench and sat with President Judge Keller. Moreover, he took an active part in the proceedings and made a comment, albeit at side-bar, adverse to the position taken by Darcy on the very important issue as to whether evidence of a subsequent armed robbery committed by Darcy, Foster and Zeitz was admissible. As has been said, Judge Boyer apparently participated in the consideration of the ruling made immediately thereafter adverse to Darcy's position. This course met with strenuous objection by Darcy's counsel who did not, however, move for the withdrawal of a juror and for a mistrial.

It is not suggested that the Judges of the Court of Oyer and Terminer did not have the right to confer with each other but all the circumstances attendant on Judge Boyer's actions raise a substantial question for consideration by the court below as to whether or not Judge Boyer's conduct did not prejudice Darcy's cause in the minds of the jury.

It is noted that on the extensive voir dire examination of the talesmen that the persons who subsequently comprised Darcy's jury stated either that they had not read about the Foster and Zeitz trial or that they had not been influenced by what they had read. One may doubt the ability of the human mind to exclude such material from consideration no matter how sincere an effort is made to do so. Judge Boyer's actions may have brought back vividly to the minds of some members of Darcy's jury the Foster and Zeitz trial, the sentencing of White and Judge Boyer's attitude toward the *outlander* criminal.

9. Counsel for Darcy in the habeas corpus proceeding in the court below in open court during the argument and colloquy went much further in attacking Darcy's counsel at the trial before the Court of Oyer and Terminer than they did in the petition for habeas corpus. They asserted in the court below that Darcy was defended by counsel of "such gross negligence and incompetency" that his trial was a legal sham. See transcript of April 11, 1951, p. 107. The allegations of incompetency of counsel set up in the

agraph—would, if proved, justify the issuance of the writ, State remedy being exhausted. If Darcy's trial was conducted in an atmosphere of hysteria and prejudice, Darcy was deprived of the rights guaranteed to him by the Fourteenth Amendment. See Shepherd v. Florida, 341 U.S. 50, 51, 71 S.Ct. 549, 95 L.Ed. 740. Even if these allegations are "improbable" or "unbelievable", to employ the words of Walker v. Johnston, 312 U.S. at page 284, 61 S.Ct. 574, Darcy cannot be deprived of the opportunity to support them by evidence again assuming exhaustion of State remedy. The difficulty in affirming the decision of the court below lies in the circumstance that the "undisputed" and "incontrovertible" facts which appear from the record made in the Court of Oyer and Terminer are insufficient to controvert the broad allegations of the petition.

For example as to item "(1)" set out in the last preceding paragraph but one of this opinion, the incontrovertible fact that Darcy's counsel was allowed wide latitude in examination of veniremen on voir dire is insufficient to overcome the allegations that Darcy's trial was conducted in an atmosphere of hysteria and prejudice for the allegations are very broad ones; nor

can these allegations be refuted by reference to the newspaper articles attached to the petition which the court below deemed insufficient of themselves to show an atmosphere of hysteria or prejudice. The court seemed to reach this conclusion again because of the latitude allowed Darcy's counsel on voir dire examination. On remand the court below must allow Darcy an opportunity to support his allegations by evidence and appropriate findings of fact and conclusions of law must be made. Cf. the circumstances alleged in United States ex rel. Daverse v. Hohn, 3 Cir., 198 F.2d 934.

I point out also that the conclusion expressed by the trial court as to "(2)", as set out in a preceding paragraph of this opinion, viz., that Darcy's counsel conducted his trial in the Court of Oyer and Terminer in a reasonably competent manner cannot be sustained on the present record. The allegation is that Darcy's counsel did not properly prepare his case and was guilty of such negligence and incompetency as to render the trial a sham.[10] Neither the court below nor this court can do more than speculate as to the course followed by Darcy's counsel at the trial. Speculation cannot serve in lieu of findings.

second petition for habeas corpus filed with the Supreme Court of Pennsylvania were also stronger than those set up in the petition for habeas corpus in the court below. The question remains one of degree, however. A fair reading of the whole petition for habeas corpus filed in the court below shows that Darcy attacks his trial counsel on the grounds that he was not diligent, was negligent and was incompetent to such a degree that he, Darcy, was not afforded a fair trial.

Nothing said here is intended in any respect to reflect on Darcy's counsel at the trial before the Court of Oyer and Terminer. This must be made plain. It is necessary to deal with the questions presented in the terms employed by Darcy's counsel in the petition and at the hearings in the court below and in this court.

10. As has been pointed out, Darcy's trial commenced three days after the trial of Foster and Zeitz had been concluded. No application for change of venue was

made by Darcy's counsel though he suggested that he would make such a motion when, at the close of the second day, June 8, it appeared that the panel might be exhausted. Darcy's counsel apparently had in mind the provisions of Section 1 (Third) of the Pennsylvania Act of March 18, 1875, P.L. 30, 19 P.S.Pa. § 551, which provide for a change of venue when the panel has been exhausted.

It should be noted that Darcy had been granted a separate trial pursuant to the Pennsylvania Act of March 31, 1860, P.L. 427, § 40, 19 P.S.Pa. § 785, which provides that in cases of felonious homicide that " * * * the parties charged shall have the right to demand separate trials * * *." The purpose of the 1860 Act plainly was to afford a fair trial to an accused. One may doubt the efficacy of a severance under the circumstances at bar when Darcy's trial was proceeded with three days after the trial of Foster and Zeitz had been concluded and when neither continuance nor change of venue was granted, sua sponte or otherwise by the court.

There is another most difficult problem in respect to the conduct of counsel in this troublesome case. Was the failure of Darcy's counsel to present evidence of his alleged previous good character and as to his mental condition due to incompetency or lack of preparation, or was it a part of a well thought out plan of defense? It was suggested by Judge Murphy in the court below and by the present writer in the argument before this court that perhaps the reason why Darcy's counsel, a lawyer of long experience at the bar, did not call Darcy or other witnesses on his behalf at his trial in the Court of Oyer and Terminer was because had he done so he would have lost the benefits of the Act of July 3, 1947, P.L. 1239, amending the Act of March 15, 1911, P.L. 20, 19 P.S.Pa. § 711. To state the matter baldly and perhaps to oversimplify it, if the Act of July 3, 1947, was constitutional and Darcy and other persons had been called as witnesses in his defense, as to the matters hereinbefore referred to, Darcy's counsel could have concluded that Darcy thereby would have lost the benefits of the Act of 1947. It must be borne in mind that Darcy's counsel had already concluded that the Court of Oyer and Terminer had committed error in admitting in evidence testimony as to the armed robbery perpetrated by Darcy and his companions shortly subsequent to their robbery at the Feasterville Tavern. Darcy's counsel had saved an exception to the ruling of the Court of Oyer and Terminer admitting such evidence and had moved for the withdrawal of a juror. If the Act of 1947 was constitutional and Darcy went on the witness stand or others did on his behalf, Darcy might have lost the benefit of what Darcy's counsel may have considered a valid exception. Darcy's counsel also would have lost what he believed to be his right to a closing argument to the jury, and, most important of all, would have opened the door to the Commonwealth to prove Darcy's bad character or reputation and any pertinent criminal record which he may have possessed. There is no question but that had Darcy's counsel put him or witnesses on his behalf on the stand that the Commonwealth would have been entitled to prove bad character or reputation and criminal record.

It must also be remembered that at the time of Darcy's trial before the Court of Oyer and Terminer the decision of the Supreme Court of Pennsylvania in Commonwealth v. DePofi, 1949, 362 Pa. 229, 66 A. 2d 649, declaring the whole of the Act of 1947 unconstitutional, Mr. Justice Jones dissenting, had not been handed down. The state of the rules of evidence following the amendments to the Act of 1911 effected by the Act of 1947 was a very confused one as the Presiding Judge at Darcy's trial in the Court of Oyer and Terminer stated. Darcy by virtue of the decision of the Supreme Court of Pennsylvania in the DePofi case was in effect tried under rules which were changed substantially during the course of the proceedings. Compare the circumstances presented by a criminal proceeding in a United States District Court in Sunal v. Large, 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982. See also the dissenting opinions by Mr. Justice Frankfurter and Mr. Justice Rutledge. Bear in mind that an unconstitutional statute was involved: not an interpretation of a constitutional statute, albeit by the Supreme Court of the United States as in Sunal. The situation presented is the reversed image of that set out in Ex parte Yarborough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274, where conviction was had under a statute alleged to be unconstitutional. But should counsel for a defendant in a capital case be compelled to speculate as to the constitutionality of a statute which purported to afford the defendant substantial rights? To say that the Pennsylvania Act of 1947 deals only with the admission of evidence, and therefore is of a procedural rather than of a substantive nature, is to deal again with the wearisome clichés of where form ends and substance begins. Reliance upon the 1947 Act, if there was such reliance, struck to the heart of the question as to whether Darcy should live or die. As Judge Learned Hand said in United States ex rel. Kulick v. Kennedy, 2 Cir., 157 F.2d 811, 813, the writ of habeas corpus is available not only to determine points of jurisdiction, *stricti juris,* but also " * * * whenever else resort to it is

necessary to prevent a complete miscarriage of justice." Under the circumstances of Darcy's trial Darcy's counsel may have been lead into a trap created by the statute respecting the vital issues of the degree of murder and the penalty, whether life imprisonment or death, to be imposed by the jury under Section 701 of the Pennsylvania Act of June 24, 1939, P.L. 872, 18 P.S.Pa. § 4701. If so, there was a miscarriage of justice. Certainly Darcy's counsel could have had good reasons for concluding that the 1947 Act was constitutional. Compare the opinions of Chief Justice Maxey and Justice Jones in the DePofi case.[11]

Is there a constitutional issue insofar as the case at bar is concerned presented by the amendments of the Act of 1947 to the Act of 1911 in the light of the decision of the Supreme Court of Pennsylvania in DePofi? If such a question is presented, is it ripe for disposition by this court on the instant record? Suppose Darcy's counsel did not call Darcy or witnesses on his behalf because Darcy's counsel was negligent or because he was so incompetent that he was unaware that a defendant on trial for murder had such a right.[12] Would a constitutional question then be presented? Would there be no constitutional question if Darcy's counsel did not offer evidence on his behalf in furtherance of a plan of calculated risk based on the assumption, subsequently demonstrated to be invalid, that the Act of 1947 was constitutional? The time to answer these questions is not yet ripe.

Darcy was entitled to be competently defended by counsel learned in the law. Though questions of degrees of competency and learning may always be present there is assuredly a level below which the courtroom performance of counsel representing a defendant in a capital case may not sink or the Fourteenth Amendment will be encountered. It is not necessary here to discuss or determine questions of degree, what degree of negligence or incompetence may be sufficient, or what insufficient, to void a criminal trial. If Darcy's counsel was so negligent or incompetent that he was deprived thereby of a valid defense or suffered the imposition of a penalty of death, a constitutional question is presented. See Tompsett v. State of Ohio, 6 Cir., 146 F.2d 95, 98–99, and the authorities therein cited; United States ex rel. Feeley v. Ragen, 7 Cir., 166 F.2d 976, 980–981; Jones v. Huff, 80 U.S.App.D.C. 254, 152 F.2d 14, 15–16; United States v. Wight, 2 Cir., 176 F.2d 376, 378–379; United States v. Bergamo, 3 Cir., 154 F.2d 31, 34–35; Abraham v. State, 228 Ind. 179, 184, 91 N.E.2d 358, 360; Miller v. Hudspeth, 164 Kan. 688, 707, 192 P.2d 147, 162. See Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L. Ed. 1461, and Miller v. Hudspeth, 10 Cir., 176 F.2d 111. See in particular Commonwealth v. O'Brien, 312 Pa. 543, 546, 168 A. 244, 245; Commonwealth v. Balles, 160 Pa. Super. 148, 154, 50 A.2d 729, 732, and Commonwealth v. Jodlowsky, 163 Pa.Super. 284, 286, 60 A.2d 836, 837. Nor should it be deemed to be a pertinent distinction that the defendant's counsel is selected by himself or by members of his family or his friends rather than appointed by the court. See Sanchez v. State, 199 Ind. 235, 157 N.E. 1.

If, on the other hand, Darcy's counsel exercised his judgment and concluded for sufficient reasons that he could rely on the constitutionality of the Act of 1947, another question also relating to Darcy's rights under the Fourteenth Amendment comes before the court. See Patterson v. Colorado, 205 U.S. 454, 461, 27 S.Ct. 556, 51 L. Ed. 879. Cf. Boyd v. State, 94 U.S. 645, 24 L.Ed. 302; Frank v. Mangum, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969; Ross v.

11. See also the opinion of the Supreme Court of Pennsylvania, and that of Mr. Justice Jones, dissenting, in Commonwealth v. Darcy (Darcy's appeal from the judgment of the Court of Oyer and Terminer), 362 Pa. 259, 66 A.2d 663.

12. It must be noted in respect to this issue that Darcy's mental condition, even if it was such as not to amount to mental illness, incompetency, or "insanity" in the legal sense, may nonetheless have been relevant to the imposition of the penalty upon him by the jury under Section 701 of the Act of June 24, 1939.

Oregon, 227 U.S. 150, 33 S.Ct. 220, 57 L. Ed. 458, and United States v. General Electric Company, D.C.S.D.N.Y., 80 F.Supp. 989, 1004. The two questions, however, have different operative facts and in the absence of a finding by the court below as to why Darcy's counsel offered no testimony on his behalf an opinion which might be purely advisory should not be hazarded. See the concurring opinion of Mr. Justice Stone and Mr. Justice Cardozo in Borden's Farm Product Co. v. Baldwin, 293 U.S. 194, 213, 55 S.Ct. 187, 193, 79 L.Ed. 281.[13] These and kindred matters should also be examined by the court below on remand and appropriate findings of fact and conclusions of law should be made.

One other difficult question remains for discussion, again in a delicate area. As has been repeatedly stated, at the time the court below entered its final judgment, viz., on April 11, 1951, the Supreme Court of Pennsylvania had denied Darcy's second petition for habeas corpus but no application for certiorari had been made to the Supreme Court of the United States.[14] On this date the relator had *not* exhausted his State remedy. The first hearing before the court below on the instant petition commenced on Thursday, April 5, 1951, and continued throughout that day. It was pointed out by the court that the Supreme Court of Pennsylvania was meeting on Monday, April 9, and that Darcy would have an opportunity to present his second petition for habeas corpus to that Court for appropriate action on that day. Thus, Darcy would be and was afforded an opportunity to take at least the first step toward the exhaustion of his State remedy. The court below expressly stated that it would continue the hearing on the instant petition for habeas corpus to Tuesday, April 10, admonishing counsel for Darcy to be then present. It also expressly extended the stay of execution of Darcy's sentence until that day.[15] The court below also pointed out that if the Supreme Court of Pennsylvania or the Supreme Court of the United States did not grant a stay, a further application for stay of execution would have to be made to it. But it was apparent that if the Supreme Court of Pennsylvania denied Darcy's second petition and he was to have the opportunity to exhaust his State remedy by an application for certiorari to the Supreme Court of the United States, a further stay was necessary—at least beyond Wednesday, April 11, when the final order of the court below was handed down. If a stay was not granted the case might become moot by reason of Darcy's execution. A stay could have been granted by the Supreme Court of Pennsylvania,[16] or by the Supreme Court of the United States. Execution of the sentence could have been further stayed by the court below if Darcy's request had not been refused.

Difficulty lies in ascertaining what was in the mind of the court below when it denied a further stay as pertinent to a ruling by us as to whether the decision of the court below denying a further stay and dismissing the petition should be sustained on the ground that at the time the court below entered its final order on April 11, 1951, Darcy had not exhausted his State remedy because he had not made an application for

---

13. Mr Justice Stone and Mr. Justice Cardozo stated, "We are in accord with the view that it is inexpedient to determine grave constitutional questions upon a demurrer to a complaint, or upon an equivalent motion, if there is a reasonable likelihood that the production of evidence will make the answer to the questions clearer."

14. The application for certiorari was filed with the Supreme Court of the United States on June 12, 1951, as we have stated. The extended period of time intervening between April 11 and June 12, 1951, suggests that the technique of exhausting the State remedy was not too hotly pressed. The record was an extended one, however.

15. See notes 2 and 3, supra.

16. It is not clear from the record whether a stay of execution was sought in the Supreme Court of Pennsylvania after the denial of the petition for habeas corpus to permit Darcy to file an application to the Supreme Court of the United States. Judge Murphy said that none was filed. It appears that no application for a stay was made to the Supreme Court of the United States.

certiorari to the Supreme Court of the United States. Assuming that the court below was aware, as must have been the case, that the Supreme Court of Pennsylvania might deny the second petition for habeas corpus and assuming further that the court below intended to afford Darcy the opportunity by his second petition for habeas corpus to exhaust his State remedy, how could the court below have concluded that the relator could have made application for certiorari to the Supreme Court of the United States on the day following the denial of the writ by the Supreme Court of Pennsylvania, viz., on April 11 and have had it acted upon on the same day?[17] There appears to be no adequate answer to this question.

■■ The issue of whether Darcy had a fair trial was one confided to the court below by the Constitution of the United States. It was the duty of that court to determine that issue, as it attempted to do. The court below refused to continue the stay and a new stay order was issued by this court. It examined the issues as to whether the stay should be continued as well as the gist of the controversy—viz., whether Darcy had received a fair trial. In the light of all the circumstances it must be concluded that the court below desired to afford Darcy a full and fair opportunity to exhaust his State remedy and that the decision of the court below should not be affirmed on the ground that when the final order on April 11, 1951 was entered Darcy had not then exhausted his State remedy as he has now. Justice requires the case be treated as one in which Darcy has exhausted his State remedy as of April 11, 1951.[18] The very recent decisions of the Supreme Court of the United States in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, and in United States ex rel. Smith v. Baldi, 344 U.S. 561, 73 S.Ct. 391, do not require a different conclusion. The crime which Darcy admittedly committed was a brutal one, meriting severest moral condemnation, but he must be granted his full legal rights. Justice must be done for him as it must be done for all.

■ There is, however, a purported issue raised by the petition and its exhibits which should not be gone into on remand. The jurors of the Darcy trial were interrogated post their verdict and the trial as to whether, if evidence had been given by persons of standing in the community, as to Darcy's prior good behavior, character, reputation, and mental condition, they would have imposed the sentence of death upon him.[19] Attached to the petition are a number of letters from jurors so stating. The course pursued of interrogating jurors after their verdict as to whether, if certain evidence had been submitted to them, they would have reached a different verdict or would have imposed a different sentence, cannot be tolerated. To do so would be to strike a grave, if not an almost fatal blow, at the jury system. This court already has had occasion to refer to a situation respecting interrogation of a juror in United States ex rel. Daverse v. Hohn, supra, 198 F.2d at page 938. The background of facts in the Daverse case are very different from those at bar but each case involves an unnecessary and undesirable harassment of juries post the return of verdict and of trial. The ills which the jury system would incur from the course pursued by Darcy in the instant case should be instantly apparent to every judge and every practicing attorney.

McLAUGHLIN, Circuit Judge, joins in all the views expressed in this opinion.

---

17. See the colloquy between the court and counsel on the final day of the hearing in the court below, viz., on April 11, 1951. Transcript pp. 139–146. See also D.C., 97 F.Supp. 930, 933.

18. Such a course also will save much time. Otherwise Darcy, in our view, will be compelled to start a new proceeding in the court below.

19. It must be borne in mind, as stated in the body of this opinion, that pursuant to Section 701, Act of June 24, 1939, P.L. 872, 18 P.S.Pa. § 4701, the jury not only finds whether or not the person charged is guilty of murder of the first or second degree but also fixes the penalty to be imposed upon him, viz., either death or life imprisonment.

KALODNER and HASTIE, Circuit Judges, join in the views expressed in this opinion insofar as they relate to the alleged atmosphere of hysteria and prejudice prevailing at Darcy's trial, including any issues raised by Judge Boyer's asserted visits to the courtroom during Darcy's trial.

MARIS, Circuit Judge.

The relator, David Darcy, has appealed from the denial by the United States District Court for the Middle District of Pennsylvania of his petition for a writ of habeas corpus. It appears that the relator and three companions, Foster, Zeitz and Capone, engaged on December 22, 1947, in the armed robbery of the Feasterville Tavern, near Doylestown, Pennsylvania, and that while the four of them were fleeing in an automobile from the scene of the robbery a bystander, Kelly, was shot and killed by Zeitz. As a result of this homicide the relator and his three companions were indicted in the Court of Oyer and Terminer of Bucks County, Pennsylvania, for the murder of Kelly. Zeitz and Foster were tried first on this charge and were found guilty of first degree murder and sentenced to death. In the following week, the relator was placed on trial in the same court. On June 14, 1948 he was found guilty of murder in the first degree and in his case also the jury fixed the penalty at death.

After the denial by the Court of Oyer and Terminer of a motion for a new trial, the relator appealed to the Supreme Court of Pennsylvania which on May 26, 1949 affirmed his conviction. Commonwealth v. Darcy, 362 Pa. 259, 66 A.2d 663. A petition for certiorari was denied by the Supreme Court of the United States on October 24, 1949. Darcy v. Com. of Pennsylvania, 338 U.S. 862, 70 S.Ct. 96, 94 L. Ed. 528. On August 1, 1949, the relator petitioned the Supreme Court of Pennsylvania for a writ of habeas corpus. This was denied by the court without opinion on August 12, 1949. The Supreme Court of the United States denied certiorari on October 24, 1949. Com. of Pennsylvania ex rel. Darcy v. Handy, Warden, 338 U.S. 862, 70 S.Ct. 96, 94 L.Ed. 528. After fruitless applications to the Pennsylvania Board of Pardons for commutation of his sentence the relator filed a petition in the Supreme Court of Pennsylvania on April 2, 1951 for certiorari to the Court of Oyer and Terminer of Bucks County and for reargument nunc pro tunc. In this petition for the first time he raised nearly all the constitutional grounds for relief which are relied upon in the petition now before us. This petition was denied by the court without opinion on April 3, 1951. On the same day the relator filed in the United States District Court for the Middle District of Pennsylvania the petition for a writ of habeas corpus, the denial of which is the subject of the present appeal. The relator's execution, repeatedly postponed, had been set for April 4, 1951 and the district court granted a stay of execution pending the determination of the petition for a writ of habeas corpus.

A hearing on the petition was held by the district court on April 5, 1951, at which time the respondents orally moved to dismiss it as insufficient in law. The constitutional grounds for relief upon which the relator relied had not previously been submitted to the Supreme Court of Pennsylvania except on the petition for certiorari and reargument. Since it appeared to the district court that the denial of that petition may have been on purely procedural grounds not involving the merits of the contentions advanced therein, the court continued the hearing until April 10, 1951 in order to afford the relator an opportunity to petition the Supreme Court of Pennsylvania for a writ of habeas corpus on these constitutional grounds and for a stay of execution. The relator filed such a petition on April 9, 1951 which set forth all the grounds for relief asserted in the petition previously filed in the district court and now before us. This petition was denied by the Supreme Court of Pennsylvania on April 10, 1951. Commonwealth ex rel. Darcy v. Claudy, 367 Pa. 130, 79 A.2d 785. The relator's subsequent petition for certiorari to the Supreme Court of the United States was denied on October 8, 1951. Com. of Pennsylvania ex rel. Darcy v. Claudy, Warden, 342 U.S. 837, 72 S.Ct. 61, 96 L.Ed. 632.

On April 10, 1951 the district court resumed the hearing on the relator's petition. The hearing was concluded on April 11th, on which day the court dismissed the petition, denied a further stay of execution and stated that a memorandum opinion setting out the reasons for its action would be filed subsequently. The opinion was filed on May 17, 1951. 97 F.Supp. 930. Immediately after the dismissal by the district court of relator's petition for a writ of habeas corpus he took an appeal to this court and applied to us for a stay of his execution which we granted pending hearing and determination of the appeal.

The exact route by which the district court reached its conclusion to dismiss the petition is not entirely clear. At the time that it acted the contentions raised in the petition had been presented to and rejected by the Supreme Court of Pennsylvania but an application to the Supreme Court of the United States for certiorari had neither been made nor denied. Referring to the rule laid down in Darr v. Burford, 1950, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761, the court appears to have concluded that the relator had not yet exhausted his state remedies and accordingly refused to grant the writ. The court, however, went further in its opinion and proceeded to consider on its merits the respondents' motion to dismiss the petition as insufficient in law to justify the issuance of a writ.

I think that the district court had power to consider the petition and to dismiss it if found insufficient in law even though the relator had not at the time exhausted his state remedies. It is true that Section 2254 of Title 28 United States Code, provides that:

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State * * *."

But as Judge Hastie stated in his concurring opinion in United States ex rel. Auld v. Warden of New Jersey State Penitentiary, 3 Cir., 1951, 187 F.2d 615, 621, the "judicial power to dismiss a petition on its merits is not destroyed by the statutory limitation on the granting of affirmative relief" which is imposed by Section 2254. To the same effect is United States ex rel. Scott v. Babb, Sheriff, 7 Cir., 1952, 199 F.2d 804, 806. Moreover it must be recognized that since the decision of the district court was rendered relator has exhausted his state remedies by seeking certiorari which was denied. I accordingly proceed to consider the question whether the district court erred in dismissing the petition for habeas corpus for insufficiency in law.

It is settled that in determining whether a petition for a writ of habeas corpus presents a prima facie case for the issuance of the writ a federal court must look not only to the face of the petition itself but also to the record of the proceeding which constitutes the basis for the petitioner's detention and of any prior applications by him for habeas corpus.[1] This appears to be what the district court did in this case. The question which is presented for determination accordingly is whether, upon the consideration by the district court of the allegations of the petition and of the facts appearing in the record of the relator's trial in the Court of Oyer and Terminer of Bucks County and of the subsequent proceedings on appeal and by way of petitions for habeas corpus, the court erred in concluding that the relator had not made allegations sufficient to entitle him to a hearing at which he might offer evidence in support of his application. The determination of this question requires the consideration, in the light of certain incontrovertible facts appearing in the record, of the allegations contained in the relator's petition in order that it may be determined whether these allegations, if established by evidence, would entitle him to the issuance of the writ.

1. Dorsey v. Gill, 1945, 80 U.S.App.D.C. 9, 148 F.2d 857, 869–871, certiorari denied 325 U.S. 890, 65 S.Ct. 1580, 89 L.Ed. 2003; Darr v. Burford, 1950, 339 U.S. 200, 215, 70 S.Ct. 587, 94 L.Ed. 761; Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397.

The basic allegation of the relator's petition is that he was denied by the Commonwealth of Pennsylvania a fair and impartial trial in violation of the Fourteenth Amendment. The reasons he alleges for this assertion fall into two main categories.

## I

The first reason alleged by the relator is that the jurors who convicted him and fixed his punishment at death were influenced and prejudiced against him as a result of hysteria and prejudice which swept the county seat of Doylestown as a result of the Zeitz and Foster trial and verdict in the preceding week and by reason of certain statements and actions of the judge who had presided at that trial. Specifically the allegations of the petition are that the relator was placed on trial at Doylestown on Monday of the week immediately following the trial and conviction of Zeitz and Foster and that upon their conviction Judge Calvin S. Boyer, who presided at their trial, openly and publicly praised the jury for their verdict, his remarks being reported in the local newspaper.[2]

The petition then alleges that "the hysteria and prejudice, which swept the town, as the result of the Zeitz and Foster trial and verdict, was so general as to influence beyond a slight degree those jurors included in the panel from whom the jurors who actually tried the relator upon the charge of murder were selected," and that nevertheless instead of postponing the relator's trial until a later date he was forced to go on trial before Judge Hiram H. Keller, the president judge of the court, "and jurors, who had been drawn from a second panel and were familiar with what had transpired during the prior week in the Zeitz and Foster trial and the relator's connection therewith and the judge's utterances and the public and newspaper comments thereon."

The petition further alleges in support of this contention that during the course of the relator's trial Judge Boyer "appeared at different times in the court room, where he could be plainly seen and observed by the jury trying the relator, and at times sat upon the bench and assisted and conferred with Judge Keller in the conduct of the trial of the relator and at other times elsewhere in the court room, but at all times the presence of Judge Boyer reminded the jurors serving in the relator's trial of the trial of Zeitz and Foster and the expressed commendatious attitude of Judge Boyer toward that verdict."

Finally in this regard the petition asserts that during the course of the relator's trial Judge Boyer in sentencing to prison a young man from Philadelphia who had pleaded guilty to stealing a car radio out of an automobile had berated the youth for coming from Philadelphia to Bucks County and engaging in the thievery in question, that his statement was quoted in the local newspaper,[3] and "would be definitely reflected in the jury box and would be prejudicial to their relations in having a fair and impartial trial."

In considering whether the foregoing allegations of the petition state a prima facie case of a trial so unfair to the relator as to violate the due process clause of the Fourteenth Amendment I take into account certain incontrovertible facts appearing

---

2. The petition alleges that the Doylestown Daily Intelligencer quoted Judge Boyer as saying:

"I don't see how you could, under the evidence, have reached any other verdict. Your verdict may have a very wholesome effect on other young men in all vicinities who may come to realize the seriousness of the folly in which so many young men indulge in these days. The only hope of stemming the tide of such crime by youth is to impose the law which you have indicated by your decision."

3. The petition alleges that in the issue of the Doylestown Daily Intelligencer for June 12, 1948 Judge Boyer is reported to have stated in sentencing the young man, Robert White:

"We don't propose to nail all our property fast here in Bucks County just because thieves from Philadelphia want to pick up everything which isn't being watched. What business did you have to come up here in the first place? So far as your testimony is concerned, you have not shown any excuse here at all to come out of Philadelphia to Bucks County."

from the record of the trial, a transcript of which was before the district court and is included in the record on this appeal. One of these is that at no time prior to the commencement of the trial did the relator's counsel or the relator himself move for or in any way suggest the need for a continuance or a change of venue, although there is express statutory authority in Pennsylvania for the latter when it is made to appear to the satisfaction of the court that, from undue excitement against the prisoner in the county where the offense was committed, a fair trial cannot be had or that there exists in that county so great prejudice against him that he cannot obtain a fair trial.[4]

The other significant fact which cannot be controverted is that the relator's counsel conducted a thorough and searching preliminary examination of the jurors impaneled in his case. In this connection it appears that the panel of jurors was excused from the courtroom and thereafter as the names of prospective jurors were called each one was brought into the courtroom individually and questioned on his voir dire in order to determine whether he could serve fairly and impartially in the case. The examination went into the events of the prior week, into what the prospective jurors had heard or read prior to coming to court, and generally inquired as to their state of mind with respect to fairness and impartiality in the light of all these matters. The record also shows that although many prospective jurors who stated that they had formed opinions on the case were excused, all of the jurors who were accepted stated under oath that they had formed no opinion as to the relator's guilt. It also appears that in the selection of the jury, including two alternates, the relator exhausted only seven of a possible 20 peremptory challenges available to him.

With respect to the participation of Judge Boyer in the trial the only reference appearing in the record is to his participation in a side bar conference between relator's counsel and Judge Keller regarding the question as to the admissibility under the Pennsylvania statutes of evidence of other crimes.

Do the averments of the relator's petition which I have summarized portray a trial so basically unfair as to amount to a mere sham or mockery of a trial by which the relator is being deprived of his life by the Commonwealth of Pennsylvania in violation of the Fourteenth Amendment? My considered judgment is that these allegations examined in the light of the incontrovertible facts of record wholly fail on their face to indicate that the trial was unfair or that the proceedings suffer any constitutional taint.

It is true, of course, that if the proceedings in a courtroom are dominated by a mob which is milling about the courthouse so that the jury is actually intimidated or if public passion and prejudice are so great as to be irresistible by normal human beings serving as jurors a trial held under such circumstances must be a mere sham and pretense of due process and the Fourteenth Amendment is violated if a defendant is deprived of life or liberty thereby.[5]

On the other hand it must be recognized that a jury trial, just as every other human enterprise, is a fallible proceeding. Every juror who has ever been impaneled has been subject in greater or lesser degree to human passions and prejudices. These he is required to lay aside when he takes his oath as a juror. How successfully this is accomplished in practice has always been a matter of dispute but the deep and abiding place which the jury system has achieved in our institutions attests the fact

---

4. Act of March 18, 1875, P.L. 30, § 1, 19 P.S.Pa. § 551.

It may be noted that counsel for the relator did suggest after the impaneling of the 12 members of the jury and before the drawing of two alternate jurors that he would move for a change of venue if the panel of jurors originally summoned should be exhausted before the alternates were selected. Since the panel

subsequently proved sufficient and the alternates were actually selected from it the motion was never made.

5. See, e. g., Frank v. Mangum, 1915, 237 U.S. 309, 335, 35 S.Ct. 582, 59 L.Ed. 969; Moore v. Dempsey, 1923, 261 U.S. 86, 91, 43 S.Ct. 265, 67 L.Ed. 543; Powell v. State of Alabama, 1932, 287 U.S. 45, 51, 53 S.Ct. 55, 77 L.Ed. 158.

that the standard of impartiality has normally been attained to a degree which is satisfactory to the community.

No one would contend, however, that jury trials do not take place from time to time in which individual jurors permit passion or prejudice to play a part in their deliberations. That such instances occur, however, is not to say that the trials in which they take place afford less than due process of law. For due process of law does not require perfection or exclude the element of human fallibility and error.[6] Moreover it is impossible to prove the existence of passion or prejudice on the part of a juror since the maintenance of the secrecy of the jury room is of far greater importance to the integrity of the jury system than the searching out of an occasional aberration on the part of an individual juror. Indeed as I shall point out later this principle goes so far as to prohibit as a matter of public policy the subsequent interrogation of jurors with respect either to their votes or their views upon questions involved in a case in which they have previously rendered a verdict.

Accordingly when we are called upon to determine whether a trial has been so far free from the influence of passion, prejudice or fear as to be fair under the constitutional standard I think that we can only apply an objective test, namely, whether the circumstances of passion, prejudice or fear surrounding the trial were such that human beings of ordinary character and firmness serving as jurors could not have been expected to give fair and impartial consideration to the defendant's case. This test may be difficult to apply in cases in which the facts are close to the line between what is fair and what is unfair. In the present case, however, I am satisfied that the circumstances disclosed by the relator's petition do not cross the line into the realm of unfairness.

The statement of Judge Boyer to the Zeitz and Foster jurors amounted to no more than a commendation of them upon the completion of a difficult and unpleasant duty. His expressed hope that the verdict would influence others against indulging in similar criminal conduct was but an expression of one of the basic purposes of criminal punishment and was certainly not directed against the relator whose acts had already been committed and who was then in custody. It is obvious that the hysteria and prejudice which the relator alleges swept Doylestown as a result of the Zeitz and Foster trial and verdict was against those who shoot down persons without cause as Zeitz had done. But such prejudice exists at all times and in all communities. It is but a phase of the natural prejudice which all law abiding citizens feel against those who disturb the peace with force and violence. It is just such prejudice that jurors impaneled in a murder case must always combat and personally lay aside in greater or lesser degree. Here the allegation is only that the jurors were influenced by this hysteria and prejudice "beyond a slight degree". I see nothing in these allegations from which it could fairly be inferred that jurors of ordinary firmness and integrity undertaking the solemn duty of trying the relator could not be expected to resist such hysteria and prejudice and render a fair and impartial verdict upon the evidence.

With respect to Judge Boyer's actions during the trial there is nothing to suggest that, even though his actions reminded the jurors of the Zeitz and Foster trial and his approval of the verdict, they placed the jurors under such pressure and so aroused their passions and prejudice as to prevent them from performing their duty impartially. Judge Boyer was a member of the court which was engaged in trying the relator. He had the right, and perhaps a duty, to confer with the presiding judge with respect to the trial. There is no suggestion in the petition or in the record that Judge Boyer did or said anything in the courtroom

6. Meidreich v. Lauenstein, 1914, 232 U.S. 236, 246, 34 S.Ct. 309, 58 L.Ed. 584; Ownbey v. Morgan, 1921, 256 U.S. 94, 110–111, 41 S.Ct. 433, 65 L.Ed. 837; Diggs v. Welch, 1945, 80 U.S.App.D.C. 5, 148 F.2d 667, 670, certiorari denied 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002; United States ex rel. Weber v. Ragen, Warden, 7 Cir., 1949, 176 F.2d 579, 586.

during the trial which was prejudicial to the relator. It is extravagant to suggest that the mere presence of one of the judges of Bucks County in a courtroom of the Bucks County courthouse could of itself be prejudicial to a defendant on trial there.

The remaining allegations of the petition with respect to the remarks made by Judge Boyer in sentencing an automobile thief are even more unsubstantial. His upbraiding of that defendant for having come from Philadelphia to Bucks County to engage in thievery expressed no more than the normal reaction of any individual in any community under the circumstances. While it may have reminded the jurors of the undesirability of having Bucks County subjected to the thieving depredations of youths from Philadelphia, that could hardly have been a new thought to any of them. On the contrary it was just the normal feeling of aversion to criminal conduct which, as I have pointed out, every juror must put aside when he is called upon to try a person accused of a serious crime.

## II

I turn then to the second category of reasons alleged by the relator for the grant of the writ. This is that his counsel committed prejudicial errors in conducting his defense. The relator alleges that he was not permitted by his counsel to testify in his own defense, that his counsel did not produce any witnesses as to his background, personal history, mental condition, prior good behavior, character and reputation, although such evidence was available and would have assisted him, that his counsel failed to have him examined by a psychiatrist whose testimony, if such an examination had been made, would also have been helpful to him, and that the failure of his counsel in these respects denied him a fair and impartial trial in violation of the Fourteenth Amendment.

In support of these allegations the petition avers that a number of the members of the jury which convicted the relator have since been interviewed and have stated that if the relator's prior good character

had been presented to them as a defense it would have influenced their verdict with respect to the imposition of the death penalty. These statements by the trial jurors ought not to be considered, however, since it was wholly improper to have obtained them. For a strong public policy prohibits such subsequent interrogation of jurors with respect to their actions as jurors or as to what their actions might have been under other circumstances. To tolerate such procedure would be to permit a body blow at the integrity of the jury system itself. This court has recently had occasion to refer with disapproval to a somewhat analogous practice with respect to a trial juror in a criminal case in United States ex rel. Daverse v. Hohn, 3 Cir., 1952, 198 F. 2d 934. The Supreme Court of Pennsylvania has repeatedly condemned the practice of interviewing jurors after verdict and obtaining from them ex parte unsworn statements in answer to undisclosed questions and representations by the interviewers. Its condemnation of the practice was reiterated in its opinion denying the relator's second petition for a writ of habeas corpus filed in that court. Commonwealth ex rel. Darcy v. Claudy, 1951, 367 Pa. 130, 133–134, 79 A.2d 785, 786, certiorari denied 342 U.S. 837, 72 S.Ct. 61, 96 L.Ed. 632. The practice cannot be tolerated if the integrity of the jury system is to be preserved.[7]

In considering the relator's allegations with respect to the asserted errors and inadequacy of his counsel, we should do so in the light of the fact appearing in the record of his trial that he was represented by two members of the Bucks County bar in good standing who, as his present counsel stated at our bar, were retained by him through a member of his family and were not appointed for his defense by the court. It is also to be observed from the record that his trial counsel participated actively in the examination on their voir dire of the persons called to serve as prospective jurors and in every later stage of the trial.

The concept of due process of law contained in the Fourteenth Amend-

---

7. See Woollomes v. Heinze, 9 Cir., 1952, 198 F.2d 577.

ment unquestionably involves the right to have the assistance of counsel for one's defense in a criminal case.[8] The amendment, however, is directed only to action by a state and its command in this regard accordingly is that the state through its officers shall not deny to a defendant in a criminal case the effective assistance of counsel for his defense. This may well impose a definite obligation upon the state through its courts to appoint competent counsel for indigent defendants in criminal cases.[9] There is, however, as Judge Huxman pointed out in Hudspeth, Warden v. McDonald, 10 Cir., 1941, 120 F.2d 962, 968, "a vast difference between lacking the effective assistance of competent counsel and being denied the right to have the effective assistance of competent counsel." It is the latter only for which the state is responsible, the former being normally the sole responsibility of the defendant who selected his counsel. And so where, as in the case now before us, a defendant in a criminal case has retained counsel of his own choice to represent him it is settled by an overwhelming weight of authority that the commission by his counsel of what may retro-

spectively appear to be errors of judgment in the conduct of the defense does not constitute a denial of due process chargeable to the state.[10]

When counsel is retained by a defendant to represent him in a criminal case he acts in no sense as an officer of the state. For while he is an officer of the court his allegiance is to his client whose interests are ordinarily diametrically opposed to those of the state. It necessarily follows that any lack of skill or incompetency of counsel must in these circumstances be imputed to the defendant who employed him rather than to the state, the acts of counsel thus becoming those of his client and as such so recognized and accepted by the court unless the defendant repudiates them by making known to the court at the time his objection to or lack of concurrence in them. A defendant cannot seemingly acquiesce in his counsel's defense of him or his lack of it and, after the trial has resulted adversely, have the judgment set aside because of the alleged incompetence, negligence or lack of skill of that counsel.[11]

Judge Minton well expressed the rule in United States ex rel. Weber v. Ragen,

8. Powell v. State of Alabama, 1934, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

9. Smith v. O'Grady, 1941, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859; Williams v. Kaiser, 1945, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398; Tomkins v. State of Missouri, 1945, 323 U.S. 485, 65 S.Ct. 370, 89 L.Ed. 407; House v. Mayo, 1945, 324 U.S. 42, 45–46, 65 S.Ct. 517, 89 L.Ed. 739; Wade v. Mayo, 1948, 334 U.S. 672, 684, 68 S.Ct. 1270, 92 L.Ed. 1647; Uveges v. Com. of Pennsylvania, 1948, 335 U.S. 437, 69 S.Ct. 184, 93 L.Ed. 127. But compare Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595.

10. Ex parte Haumesch, 9 Cir., 1936, 82 F.2d 588; Hudspeth, Warden v. McDonald, 10 Cir., 1941, 120 F.2d 962, 964, certiorari denied 314 U.S. 617, 62 S.Ct. 110, 86 L.Ed. 496; Andrews v. Robertson, 5 Cir., 1944, 145 F.2d 101, certiorari denied 324 U.S. 874, 65 S.Ct. 1013, 89 L.Ed. 1427; Tompsett v. State of Ohio, 6 Cir., 1944, 146 F.2d 95, certiorari denied 324 U.S. 869, 65 S.Ct. 916, 89 L.Ed. 1424; Morton v. Welch, 4 Cir., 1947, 162 F.2d 840, certiorari denied 332 U.S. 779, 68 S.Ct. 44, 92 L.Ed. 363; United States

ex rel. Feeley v. Ragen, 7 Cir., 1948, 166 F.2d 976; Moss v. Hunter, 10 Cir., 1948, 167 F.2d 683, certiorari denied 334 U.S. 860, 68 S.Ct. 1519, 92 L.Ed. 1780; Merritt v. Hunter, 10 Cir., 1948, 170 F.2d 739.

Likewise it has been held in cases where qualified counsel have been appointed for a defendant by the court that errors of judgment committed by such counsel in the conduct of the defense do not amount to a deprivation of due process of law. Conley v. Cox, Warden, 8 Cir., 1943, 138 F.2d 786; Diggs v. Welch, 1945, 80 U.S.App.D.C. 5, 148 F.2d 667, certiorari denied 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002; Sweet v. Howard, 7 Cir., 1946, 155 F.2d 715, certiorari denied 336 U.S. 950, 69 S.Ct. 877, 93 L. Ed. 1105; United States v. Wight, 2 Cir., 176 F.2d 376, certiorari denied 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586; United States ex rel. Weber v. Ragen, Warden, 7 Cir., 1949, 176 F.2d 579.

11. See Tompsett v. State of Ohio, 6 Cir., 1944, 146 F.2d 95, 98, certiorari denied 324 U.S. 869, 65 S.Ct. 916, 89 L.Ed. 1424.

Warden, 7 Cir., 1949, 176 F.2d 579, 586, when he said:

"As to the requirement under the Fourteenth Amendment, the services of counsel meet the requirements of the due process clause when he is a member in good standing at the bar, gives his client his complete loyalty, serves him in good faith to the best of his ability, and his service is of such character as to preserve the essential integrity of the proceedings as a trial in a court of justice. He is not required to be infallible. We know that some good lawyer gets beat in every law suit. He made some mistakes. The printed opinions that line the walls in our offices bear mute testimony to that fact. His client is entitled to a fair trial, not a perfect one."

█ █ It is true, as the relator urges, that a denial of due process of law by the state would result if the representation of a defendant by his counsel should be so lacking in competence or good faith that it would become the duty of the trial judge or the prosecutor, as officers of the state, to observe and correct it. For in such a trial the defendant would be practically without representation and it would, therefore, be but a farce and a mockery of justice. It is the duty both of the trial judge [12] and the prosecutor [13] to see that the essential rights of the defendant are preserved. As officers of the state their failure to do so is imputed to the state. But they, and through them the state, may not be convicted of a denial to the defendant of due process of law in this regard unless the incompetence of the defense is so apparent as to call for intervention between counsel and client.

█ Here, however, there is no suggestion by the relator of anything more than that his counsel made mistakes of judgment in not calling the relator to the witness stand in his own defense, in not calling witnesses to his past life and character, and in not subjecting him to a psychiatric examination. These were all questions of the type which trial counsel in criminal cases are continually called upon to meet and which they must decide under the pressure of the trial and in the light of their best judgment at the time. The fact that after the event and in the light of all that has subsequently transpired other counsel now regard as wrong the decisions thus made by relator's trial counsel cannot be made the basis for convicting the state of a denial of due process. For unless the trial judge had interrupted the trial to interrogate the relator's counsel as to the reasons for their decisions on trial strategy the judge could have had no possible basis for concluding that those decisions were ill advised. Moreover it might well be that such intervention by the trial judge in the management of the defense by the relator's counsel would itself have amounted to a denial of due process of law. For the effective assistance of counsel for one's defense involves the right of counsel and client to plan defense strategy in privacy and independently of interference or dictation by the court.

█ In the absence of such gross incompetence or faithlessness of counsel as should be apparent to the trial judge and thus call for action by him it would be destructive of the relationship of counsel and client as we know it either to permit the trial judge to dictate to counsel his trial strategy in defending his client's interests or to permit the defendant after conviction to question that strategy and in effect to put his counsel on trial with respect to it. There is no suggestion in the relator's petition that his counsel's conduct was such as to have required the intervention of the trial judge in his behalf during his trial. On the contrary, as I have already indicated, the alleged errors of which the relator now complains involved questions of defense strategy as to which experienced counsel frequently differ. The position

---

12. Glasser v. United States, 1942, 315 U.S. 60, 71, 62 S.Ct. 457, 86 L.Ed. 680.

13. Mooney v. Holohan, 1935, 294 U.S. 103, 112–113, 55 S.Ct. 340, 79 L.Ed. 791.

taken by relator's trial counsel with respect to them was not so apparently unreasonable as to call for critical examination by the trial judge. For the same reason we should not be called upon to appraise the merits of counsel's actions. I conclude, therefore, that the allegations of the petition with respect to the relator's counsel, if proved, would not afford a basis for the issuance of a writ of habeas corpus.

## III

While the federal courts have the duty to make an independent examination of the validity of an alleged denial by a state of due process of law asserted in a petition for a writ of habeas corpus, as I have done in this case, I think it not inappropriate to recall that the Supreme Court of Pennsylvania in denying the relator's second petition for a writ of habeas corpus reached exactly the same conclusion as I have reached upon exactly the same allegations and record as are before us now. Indeed under the rule laid down in Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, it may well be that the action of the district court in denying the relator a plenary hearing on his application may be supported on that ground alone. Likewise, in spite of what is said in Brown v. Allen, I cannot conceive that it is wholly without significance that these allegations and the action of the Supreme Court of Pennsylvania with respect to them did not arrest the attention of four Justices of the Supreme Court of the United States sufficiently to move them to grant the relator's petition for certiorari. In any event, I have reached the firm conviction, for the reasons stated in this opinion, that the district court did not err in dismissing the relator's petition for a writ of habeas corpus.

GOODRICH and STALEY, Circuit Judges, join in all the views expressed in this opinion.

KALODNER and HASTIE, Circuit Judges, join in the views expressed in Part II with respect to the insufficiency of the relator's allegations as to incompetency of his trial counsel, if proved, to justify the issuance of the writ of habeas corpus.

KALODNER and HASTIE, Circuit Judges (concurring).

We agree with all that is said and decided in the per curiam opinion of the court.

We also agree with Judge MARIS' analysis of the very limited reach of due process of law when invoked to remedy shortcomings of the defense made by counsel of choice in a criminal case. The district court rightly disposed of this issue.

On the other hand, we think Judge BIGGS is right in his view that enough has been alleged on the issue of prejudice inconsistent with fair trial to entitle relator to prove such prejudice if he can. The record indicates that in none of the proceedings since relator's conviction has he had an opportunity to present evidence on this issue of prejudice. We think he should have it now, for the first time, in the district court in this habeas corpus proceeding. This we understand to be consistent with the analysis made at this term for a majority of the Supreme Court by Mr. Justice Reed in Brown v. Allen, 1953, 344 U.S. 443, 460, 73 S.Ct. 397, 409, under the sectional heading "Right to Plenary Hearing".

There is in our judgment one other consideration of importance. The pleading of prejudice in the district court, as analyzed in detail by Judge MARIS, does not make it entirely clear whether new or controverted matter is relied upon as proof of prejudice. Our disagreement with Judge MARIS is on the narrow point whether enough was alleged to make it incumbent on the district judge to permit the relator to show what facts not already clear in the record of the state proceedings, he could establish. In this connection, habeas corpus procedure is flexible enough so that a district judge faced with unclear or inadequately informative pleadings may require that the relator amend or supple-

ment his petition to provide a clear statement of what, if anything, he proposes to show beyond that which already appears in the record of the state court proceedings. While Mr. Justice Jackson's procedural proposals to this effect in his separate opinion in Brown v. Allen, supra, did not elicit expressions of approval or disapproval from a majority of his colleagues, we think they supply sound and valuable guidance for district judges and should be followed in this circuit. This is what Mr. Justice Jackson said:

"If the current petition is made upon the same grounds as an earlier one, it should state fully any evidence now available in its support that was not offered before and explain failure to present it. On the jurisdictional questions appropriate ' for habeas corpus, the petitioner may not be barred from proof by newly discovered evidence, but it is not asking too much that his petition disclose that he has it and a basis for appraising its relevance and effect. He should not be precluded from raising new grounds of unconstitutionality in a later petition, especially in view of the unsettled character of our constitutional doctrines of due process. But the facts that make the new grounds applicable should appear. If federal relief is sought on the grounds that state law affords no remedy, or his resort thereto has been obstructed and he has been unable to present his case to a state court, the facts relied on should be clearly and fully set forth." 344 U.S. at pages 547–548, 73 S.Ct. at page 430.

Thus advised early in the habeas corpus proceeding, the district court and reviewing courts can more easily and surely judge whether there is real need to take testimony. Such difficulty as has divided us on that score in the present case would almost always be obviated in the district court. We strongly commend the suggested course to district judges faced, as they often are, with vague or uncertain allegations in petitions for habeas corpus.